**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 26, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ANDREW J. JOHNSON,

    Plaintiff - Appellant,

v.

CITY OF CHEYENNE, a municipal
corporation; LANCE COOPER
OVERSTREET, administrator of the estate
of George W. Stanford, deceased; ALAN
W. SPENCER, an individual, and Does 2
through 20, inclusive,

    Defendants - Appellees.

No. 22-8015

_____

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 2:17-CV-00074-SWS)**
_____

Robert P. Schuster, Robert P. Schuster, P.C., Jackson, Wyoming (Bradley L. Booke of
Robert P. Schuster, P.C., Jackson, Wyoming; Thomas N. Long and Aaron J. Lyttle of
Long Reimer Winegar Beppler LLP, Cheyenne, Wyoming; Elliot H. Scherker and
Bethany J.M. Pandher of Greenberg Traurig, P.A., Miami, Florida; and Laurence O.
Masson, Law Office of Laurence O. Masson, Berkeley, California, with him on the
briefs), for Plaintiff-Appellant.

Samuel L. Williams, Senior Assistant Attorney General (Timothy W. Miller, Senior
Assistant Attorney General, with him on the brief), Office of the Attorney General,
Cheyenne, Wyoming for Defendants-Appellees Alan W. Spencer and the estate of
George Stanford.

Norman Ray Giles, Lewis Brisbois Bisgaard & Smith, LLP, Houston, Texas (William S.
Helfand of Lewis Brisbois Bisgaard & Smith, LLP, Houston, Texas and J. Mark Stewart

of Davis & Cannon, LLP, Cheyenne, Wyoming, with him on the brief), for Defendant-Appellee the City of Cheyenne.

_____

Before **HOLMES**, Chief Judge, **TYMKOVICH**, and **CARSON**, Circuit Judges.

_____

**HOLMES**, Chief Judge.

_____

Plaintiff-Appellant Andrew Johnson was convicted of aggravated burglary and sexual assault in 1989.  In 2013, a Wyoming state court declared Mr. Johnson innocent based on DNA evidence and vacated his convictions.  Mr. Johnson then filed suit under 42 U.S.C. § 1983 against Officer Alan Spencer, the Estate of Detective George Stanford ("Detective Stanford"),[1] and the City of Cheyenne, Wyoming.  Mr. Johnson alleged that (1) Officer Spencer fabricated evidence, (2) Officer Spencer and Detective Stanford violated his constitutional rights by failing to produce exculpatory evidence, and (3) the City of Cheyenne failed to maintain adequate policing policies.  The district court granted Officer Spencer's motion to dismiss the fabrication-of-evidence claim.  The district court also granted summary judgment to Officer Spencer and Detective Stanford on the constitutional claims, finding that both were entitled to qualified immunity because Mr. Johnson failed to show that his constitutional rights had been violated.  The district court

---

[1]     Because, for purposes of this litigation, the Estate is standing in the shoes of the deceased Detective Stanford—who is alleged to have passed away in August 2007—for simplicity's sake in our analysis, we simply refer to the Estate as "Detective Stanford."

dismissed the claims against the City of Cheyenne and entered final judgment against Mr. Johnson.

Exercising jurisdiction under 28 U.S.C. § 1291, we **affirm**. We conclude that Mr. Johnson failed to plausibly allege a fabrication-of-evidence claim against Officer Spencer. Furthermore, as to his claim based on the alleged failure to produce exculpatory evidence, we determine that Mr. Johnson has failed to show that his constitutional rights were violated; consequently, Officer Spencer and Detective Stanford are entitled to qualified immunity. And, relatedly, because Mr. Johnson has not demonstrated that any City of Cheyenne law enforcement officer—including Officer Spencer and Detective Stanford—violated his constitutional rights, we conclude that the district court properly dismissed the claims against the City of Cheyenne.

**I**

**A**

At approximately 10:00 p.m. on June 10, 1989, Mr. Johnson ran into his acquaintance, Laurie Slagle, at Jesse's Cowboy Bar in Cheyenne, Wyoming. Mr. Johnson told Ms. Slagle, who had been drinking alcohol with her friends for several hours, about his recent breakup with his girlfriend. Ms. Slagle then invited Mr. Johnson to "go have a drink and talk about [the breakup]" at other local bars. Aplt.'s App., Vol. I, at 48 ¶ 38 (Compl., filed Apr. 17, 2017).

Before heading to the other bars, Mr. Johnson and Ms. Slagle detoured to Ms. Slagle's apartment, which she shared with her boyfriend, whom she believed to

3

be out of town at the time.  Mr. Johnson and Ms. Slagle drank wine and smoked marijuana in her living room together.  After noticing that the marijuana was "stemmy," Mr. Johnson used a plastic sleeve containing his driver's license and photo identification card to cull the stems from the leaves.  Aplt.'s App., Vol. VI, at 72 (Dep. of Mr. Johnson, dated Oct. 21, 2021).

Mr. Johnson and Ms. Slagle then left Ms. Slagle's apartment in her car. Mr. Johnson, however, forgot his license and photo identification card on the coffee table in Ms. Slagle's living room.  Because she "was pretty well legally intoxicated," Ms. Slagle asked Mr. Johnson to drive them to the Cheyenne Club, where they stayed only briefly before going to the Mayflower Bar.  Aplt.'s App., Vol. I, at 49 ¶ 41.

After leaving the Mayflower Bar, Ms. Slagle vomited in her car.  Mr. Johnson, still driving Ms. Slagle's car, stopped at another establishment to get materials to clean the car and instructed Ms. Slagle to wait there.  Instead, Ms. Slagle drove herself home and left Mr. Johnson behind.  Mr. Johnson then walked thirty-five minutes to his home and went to sleep.

At approximately 3:00 a.m. the next morning, Ms. Slagle's downstairs neighbor, Julie Prodis, was awakened by loud knocking on the door to the staircase leading to Ms. Slagle's apartment (which was in the attic of the building), the sound of a windowpane breaking, and footsteps walking across the broken glass and up the stairs.  Ms. Prodis then heard a woman screaming "no, no."  *Id.* at 39 ¶ 18. Ms. Prodis immediately called the police.  While on the phone with the police

dispatcher, Ms. Prodis heard footsteps walking down the stairs and the intruder exiting the apartment building.

Minutes after the intruder left, Officer Phillip E. Raybuck Sr. arrived at the scene and, soon thereafter, Officer Spencer arrived as well. The officers proceeded up the stairs and heard a woman sobbing and repeating "is he gone, is he gone?" *Id.* at 40 ¶ 20. The officers found Ms. Slagle inside her bathroom, where she repeatedly said "[h]e hurt me." *Id.* at 41 ¶ 23. When Ms. Slagle emerged from the bathroom, she was dressed in an untied robe, and her hair was tussled. When Officer Spencer asked Ms. Slagle who hurt her, she responded "A.J." *Id.* at 42 ¶ 24.

At Mr. Johnson's criminal trial, Officer Spencer testified that he pressed Ms. Slagle for more details about "A.J.," before noticing a driver's license at his feet near the bathroom. *Id.* Officer Spencer noticed that the driver's license belonged to "Andrew J. Johnson." *Id.* He then showed Ms. Slagle the driver's license and asked "[i]s this the A.J. that you're talking about?" *Id.* Ms. Slagle initially did not respond, then grew "hysteric[al]," and eventually said, "[y]es, that's A.J." *Id.* At that time, the officers believed that she had been sexually assaulted.

Officer Spencer took Ms. Slagle to Memorial Hospital in Cheyenne, where she was medically examined and had a sexual-assault kit performed. Officer Raybuck remained at the crime scene and took photographs, as was standard practice. After "load[ing] a cassette of unexposed color negative film into a 35mm camera with flash," Officer Raybuck photographed a case-identifier card and his badge number to ensure that the subsequent photographs that he took, and also the printed

photographs, could be easily linked to the correct case. *Id.* at 45 ¶ 28. Officer Raybuck took photographs of the door and stairs leading to Ms. Slagle's apartment, and he also took photographs of Ms. Slagle's arm and inner thigh when he later arrived at the hospital. Six of Officer Raybuck's photographs were provided to Mr. Johnson's trial counsel, but others were not.

At approximately 5:00 a.m. on June 11, 1989, Mr. Johnson was arrested. Two days later, Ms. Slagle found a pair of eyeglasses in her bedroom, which she believed were Mr. Johnson's. She informed Detective Stanford, who personally retrieved the eyeglasses from her apartment and interviewed her three times.

Mr. Johnson was charged with aggravated burglary and first-degree sexual assault. A jury convicted him on both counts, and his conviction was affirmed on direct appeal. *See Johnson v. State*, 806 P.2d 1282, 1283–84 (Wyo. 1991). Twenty-four years later, DNA evidence exonerated Mr. Johnson. The evidence revealed that the seminal fluid collected during Ms. Slagle's medical examination matched the DNA of her then-boyfriend—not Mr. Johnson.

**B**

In 2017, Mr. Johnson filed a civil-rights action, under 42 U.S.C. § 1983, against the City of Cheyenne, Officer Spencer, Detective Stanford, and various other unnamed individuals in the Cheyenne Police Department. Mr. Johnson claimed that Officer Spencer and Detective Stanford fabricated evidence by prompting Ms. Slagle to identify him as the intruder who broke into her apartment. Specifically, Mr. Johnson alleged that Officer Spencer—contrary to his testimony at trial—found

the driver's license on the coffee table in Ms. Slagle's living room and not outside her bathroom.  Additionally, Mr. Johnson alleged that Ms. Slagle and/or Officer Stanford deliberately falsified evidence by presenting the eyeglasses during trial.

Mr. Johnson also claimed that the defendants suppressed the photographs of the crime scene—which he argued would have exonerated him—and/or failed to preserve those photographs.  In particular, he alleged that Officer Raybuck took more photographs than were given to his trial counsel and that "[i]t is presently unknown whether the missing negative film and/or missing photographic prints therefrom have been misplaced, purposely or inadvertently destroyed, purposely or carelessly sequestered, lost, or something else improperly done with this forensic evidence." Aplt.'s App., Vol. I, at 36 ¶ 6; *see also id.* at 46–47 ¶¶ 32–36.  Lastly, Mr. Johnson claimed that the City of Cheyenne failed to maintain adequate policies and training for its officers.

In May 2017, Defendants separately moved to dismiss the complaint.  The district court granted those motions.  *See Johnson v. City of Cheyenne*, No. 2:17-cv-0074, 2017 WL 6551394, at *9 (D. Wyo. July 27, 2017) (unpublished), *aff'd in part, rev'd in part and remanded sub nom. Johnson v. Spencer*, 950 F.3d 680 (10th Cir. 2020).  The district court later denied Mr. Johnson's motion for reconsideration of that dismissal and his motion for relief from previous judgments rejecting his civil-rights claims.  *See Johnson v. City of Cheyenne*, No. 2:17-cv-0074, 2017 WL 6551397, at *7 (D. Wyo. Nov. 21, 2017) (unpublished).  On appeal, we affirmed the court's dismissal of the City of Cheyenne, reversed the dismissal of the claims

7

against Officer Spencer, and remanded the case for the court to reconsider Mr. Johnson's motion for relief from the judgments. *See* 950 F.3d at 723.

In May 2020, the district court granted Mr. Johnson's motion to set aside the judgments barring his civil-rights claims, and vacated its dismissal order. Subsequently, Defendants renewed their separate motions to dismiss.

In August 2020, the district court granted in part and denied in part the renewed motions to dismiss. The district court dismissed Mr. Johnson's fabrication-of-evidence claim, determining that the "factors of reliability . . . outweigh[ed] any suggestive or corrupting effect of the challenged identification itself." Aplt.'s App., Vol. IV, at 150 (Order Granting in Part & Den. in Part Mots. to Dismiss, filed Aug. 20, 2020). The district court found that Officer Spencer was entitled to qualified immunity with respect to the fabrication-of-evidence claim.

The court also dismissed Mr. Johnson's municipal liability claims against the City of Cheyenne. The court reasoned that the "officers were already constitutionally required to comply with the dictates of the *Brady*/*Trombetta*/*Youngblood* line of cases with respect to the disclosure and preservation of evidence," such that "it can hardly be said that a lack of, or inadequate, or failure to enforce, certain written policies or procedures regarding the proper handling and disclosure of crime scene photographs" could have caused a violation of Mr. Johnson's due process rights. *Id.* at 153 (referring to *Brady v. Maryland*, 373 U.S. 83 (1963), *California v. Trombetta*, 467 U.S. 479 (1984), and *Arizona v. Youngblood*, 488 U.S. 51 (1988)). The court, however, rejected

8

Officer Spencer's and Detective Stanford's assertion of qualified immunity as to Mr. Johnson's claims brought under *Brady* and *Trombetta*/*Youngblood*.

At the close of discovery, Officer Spencer and Detective Stanford moved for summary judgment on Mr. Johnson's *Brady* and *Trombetta*/*Youngblood* claims. In March 2022, the district court granted summary judgment to Officer Spencer and Detective Stanford, concluding that Mr. Johnson failed to establish "the existence of additional photos taken by [Officer] Raybuck of the inside of [Ms.] Slagle's apartment." *Johnson v. City of Cheyenne*, No. 2:17-cv-0074, 2022 WL 1050648, at *8 (D. Wyo. Mar. 30, 2022) (unpublished). The district court found, based on Officer Raybuck's testimony, that "[a]t best, a reasonable inference can be drawn there was a picture taken of [Ms.] Slagle's inner thigh that was lost/mis-handled and not produced to [Mr.] Johnson's defense." *Id.* The district court stated that, even if other photos existed, Mr. Johnson failed to show that "the missing evidence was materially exculpatory at the time it was lost or destroyed." *Id.* at *10.

The court also found that Mr. Johnson "failed to put forth evidence establishing the Defendants acted in bad faith" in destroying any photographs. *Id.* at *11. The court stated that "there [was] no evidence [Officer Spencer or Detective Stanford] participated in any violation of [Mr.] Johnson's constitutional rights, let alone did so knowingly or recklessly." *Id.* at *12. Accordingly, the district court concluded that Officer Spencer and Detective Stanford were entitled to qualified immunity. This timely appeal followed.

9

## II

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Grissom v. Roberts*, 902 F.3d 1162, 1167 (10th Cir. 2018) ("Under this test, [qualified] 'immunity protects all but the plainly incompetent or those who knowingly violate the law.'" (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018))). This defense "protects public employees from liability . . . [and] from the burdens of litigation" arising from their exercise of discretion. *Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1266 (10th Cir. 2013); *see also Elder v. Holloway*, 510 U.S. 510, 514 (1994) ("The central purpose of affording public officials qualified immunity from suit is to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'" (quoting *Harlow*, 457 U.S. at 806)).

## A

We review the district court's decision to grant a motion to dismiss based on qualified immunity de novo. *See Frey v. Town of Jackson*, 41 F.4th 1223, 1232 (10th Cir. 2022). "To survive a motion to dismiss based on qualified immunity, the plaintiff must allege sufficient facts that show . . . the defendant plausibly violated his constitutional rights, which were clearly established at the time of violation." *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012). Although "a complaint need not recite 'detailed factual allegations,' 'a plaintiff's obligation to provide the

10

grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021) (alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). We "may consider documents *referred to in the complaint* if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Brown v. Montoya*, 662 F.3d 1152, 1166 (10th Cir. 2011) (quoting *Alvarado v. KOB–TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007)). On a motion to dismiss, "all well-pleaded allegations of the complaint are accepted as true and viewed in a light most favorable to the nonmoving party." *Schwartz*, 702 F.3d at 579.

**B**

"We review the district court's grant of summary judgment based on qualified immunity de novo." *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017). Ordinarily, summary judgement is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). But "we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc) (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)).

When a defendant raises a qualified immunity defense on summary judgment, "the onus is on the plaintiff to demonstrate '(1) that the official violated a statutory or constitutional right, *and* (2) that the right was "clearly established" at the time of the

11

challenged conduct.'"  *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting

*Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).  "In other words, if the plaintiff fails

to establish either prong of the two-pronged qualified-immunity standard, the

defendant prevails on the defense."  *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th

Cir. 2016); *see also Cox v. Glanz*, 800 F.3d 1231, 1245 (10th Cir. 2015) ("[B]y

asserting the qualified-immunity defense, Sheriff Glanz triggered a well-settled

*twofold burden* that Ms. Cox was compelled to shoulder: not only did she need to

rebut the Sheriff's no-constitutional-violation arguments, but she also had to

demonstrate that any constitutional violation was grounded in then-extant clearly

established law.").  We have discretion to determine "which of the two prongs of the

qualified immunity analysis should be addressed first."  *Pearson*, 555 U.S. at 236.  In

making this assessment, we "ordinarily accept the plaintiff's version of the facts . . .

but 'because at summary judgment we are beyond the pleading phase of the

litigation, [the] plaintiff's version of the facts must find support in the record.'"

*A.M.*, 830 F.3d at 1136 (alteration in original) (quoting *Thomson v. Salt Lake Cnty.*,

584 F.3d 1304, 1312 (10th Cir. 2009)).

## III

This appeal presents three issues: (1) whether the district court erred in

dismissing Mr. Johnson's fabrication-of-evidence claim against Officer Spencer;

(2) whether it erred in granting summary judgment to Defendants Spencer and

Stanford on Mr. Johnson's *Brady* and *Trombetta*/*Youngblood* claims; and (3) whether

the court erred in dismissing Mr. Johnson's municipal liability claim against the City

of Cheyenne alleging, *inter alia*, unconstitutional police policies.  We conclude that the district court did not err.

Specifically, we hold that the district court correctly dismissed Mr. Johnson's fabrication-of-evidence claim because Ms. Slagle's pre-trial identification of Mr. Johnson was sufficiently reliable.  Further, we hold that the district court did not err in granting summary judgment in favor of Officer Spencer and Detective Stanford on Mr. Johnson's *Brady* and *Trombetta*/*Youngblood* claims because, among other reasons, Mr. Johnson did not establish that the photographic evidence was material within the meaning of *Brady*, and concerning his *Trombetta*/*Youngblood* claims, that the exculpatory value of this evidence was apparent or that Officer Spencer or Detective Stanford (or any other Cheyenne police officer for that matter) acted with bad faith in destroying or otherwise losing this evidence.  Lastly, we hold that the district court correctly dismissed Mr. Johnson's § 1983 claims against the City of Cheyenne because Mr. Johnson failed to demonstrate that he suffered a constitutional injury attributable to any officer of the Cheyenne Police Department.

## A

We turn first to the district court's dismissal of Mr. Johnson's fabrication-of-evidence claim against Officer Spencer.  Mr. Johnson argues that his complaint plausibly showed that Officer Spencer fabricated evidence in violation of his due process rights by prompting Ms. Slagle to identify him as the intruder who broke into her apartment before she "in any way generally or specifically identified the man who 'hurt' her."  Aplt.'s App., Vol. I, at 59 ¶ 73.  Mr. Johnson further argues that

13

Officer Spencer used what amounted to a single-photo identification procedure, "fraught with [a] substantial likelihood of misidentification." Aplt.'s Opening Br. at 55. "While we must review the district court's underlying factual findings, if any were made, under the clearly erroneous standard, the ultimate question of whether trial and pretrial identification evidence infringed due process rights is reviewed de novo." *United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir. 1994) (citation omitted); *see also United States v. Kamahele*, 748 F.3d 984, 1019 (10th Cir. 2014) ("When reviewing the admission of a photo array used to identify a defendant, we apply the clear-error standard to factual findings and engage in de novo review of due-process issues.").

Because Officer Spencer raised a qualified immunity defense in his motion to dismiss, "[w]e must decide (1) whether the plaintiff plausibly alleged a violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the alleged violation." *Frey*, 41 F.4th at 1232. We conclude that Mr. Johnson has failed to demonstrate that he plausibly alleged a violation of his constitutional rights and therefore affirm the district court's dismissal of Mr. Johnson's fabrication-of-evidence claim.

**1**

The Supreme Court has recognized "a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). Importantly,

14

however, "a suggestive preindictment identification procedure does not in itself intrude upon a constitutionally protected interest." *Manson v. Brathwaite,* 432 U.S. 98, 113 n.13 (1977). Rather, an intrusion occurs when "[t]he suggestiveness of the lineup [or photographic identification procedure] . . . create[s] a very substantial likelihood of irreparable misidentification"—*viz.*, "the tainted lineup [or photographic identification procedure] . . . so affect[s] the witnesses' perceptions as to render their subsequent in-court testimony unreliable." *United States v. Thody*, 978 F.2d 625, 629 (10th Cir. 1992); *see also Alexander v. City of S. Bend*, 433 F.3d 550, 555 (7th Cir. 2006) ("[T]he constitutional interest implicated in challenges to police identification procedures is *evidentiary* in nature.").

More specifically, the salient constitutional concern is whether an eyewitness misidentification results in a criminal defendant not having a fair trial. *See Manson*, 432 U.S. at 113 ("The standard, after all, is that of fairness as required by the Due Process Clause of the Fourteenth Amendment."); *see also Wray v. City of New York*, 490 F.3d 189, 193 (2d Cir. 2007) ("[W]e have not held that a suggestive identification alone is a constitutional violation; rather, the constitutional violation is that [the plaintiff's] right to a fair trial was impaired by the admission of testimony regarding the unreliable identification[.]"); *Alexander*, 433 F.3d at 555 ("[The] rule regarding unduly suggestive identification procedures 'is a prophylactic rule designed to protect a core right, that is the right to a fair trial, and it is only the violation of that core right and not the prophylactic rule that should be actionable under § 1983.'" (quoting *Hensley v. Carey*, 818 F.2d 646, 649 (7th Cir. 1987))); *Pace v. City of Des Moines*, 201 F.3d

15

1050, 1055 (8th Cir. 2000) ("In the context of unduly suggestive lineups, only a violation of the core right—the right to a fair trial—is actionable under § 1983.").

When an identification procedure is challenged, "[t]he inquiry . . . is two pronged: *first*, it must be determined whether the identification procedure was impermissibly suggestive; and, *second*, if it is found to have been so, whether the identification nevertheless was reliable in view of the totality of the circumstances." *Johnston v. Makowski*, 823 F.2d 387, 391 (10th Cir. 1987) (emphases added).  Under the first prong, in the case of photographic identification procedures, we consider suggestiveness in view of "the size of the array, the manner of its presentation by the officers, and the details of the photographs themselves."  *Sanchez*, 24 F.3d at 1262.

If the first prong is met, we move to the second.  Under that inquiry, though we consider the totality of the circumstances, our analysis regularly focuses on five factors—the so-called *Biggers* factors.  *See Neil v. Biggers*, 409 U.S. 188, 199–200 (1972); *see also United States v. O'Neil*, 62 F.4th 1281, 1288–89 (10th Cir. 2023) (applying the *Biggers* factors).  They are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [her] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation."  *Johnston*, 823 F.2d at 391 (alteration in original) (quoting *Manson,* 432 U.S. at 114).  We weigh these reliability factors against "the corrupting effect of the suggestive identification itself."  *Manson,* 432 U.S. at 114.  Crucially, "reliability is the linchpin in determining the admissibility of identification testimony."  *Id.*  Therefore, "if the

indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances," we will affirm the admission of the evidence. *Perry*, 565 U.S. at 232.

Applying these legal principles to the unique factual circumstances here, we determine that the identification was sufficiently reliable to outweigh any corrupting effects of Officer Spencer's allegedly suggestive procedure. Accordingly, Mr. Johnson has failed to plausibly allege a constitutional violation—*viz.*, a denial of his right to a fair trial.

**2**

Mr. Johnson argues that Officer Spencer's presentation of only his driver's license—without first obtaining a physical description of the intruder—prompted Ms. Slagle to identify him as the perpetrator. Specifically, the complaint alleges that Officer Spencer "removed Mr. Johnson's [driver's license] from [Ms. Slagle's] [a]partment coffee table when [he] did his first walk-through of the . . . living room" and then showed Ms. Slagle the driver's license "before Ms. Slagle . . . generally or specifically identified the man who 'hurt' her." Aplt.'s App., Vol. I, at 59 ¶ 73. The complaint alleges that, in so doing, Officer Spencer "prompt[ed] Ms. Slagle . . . to affirmatively assert Mr. Johnson was" her assailant. *Id.*

Unduly "[s]uggestive procedures . . . convey 'intentionally or unintentionally, that [police officers] expect the witness to identify the accused,' or are 'so arranged as to make the resulting identifications virtually inevitable.'" *O'Neil*, 62 F.4th at

1288 n.9 (second alteration in original) (first quoting *Moore v. Illinois*, 434 U.S. 220, 224 (1977); then quoting *Foster v. California*, 394 U.S. 440, 443 (1969)).

Neither the Supreme Court nor this Court has decided that a one-photo array—like the one which Mr. Johnson alleges that Officer Spencer used—is unduly suggestive per se. *See Sanchez*, 24 F.3d at 1262 (noting that "federal courts have been less than clear about what role the size of an array plays" in determining the suggestiveness of a lineup). Nevertheless, "identifications arising from single-photograph displays may be viewed in general with suspicion." *Manson*, 432 U.S. at 116; *see Sanchez*, 24 F.3d at 1263 ("The lower the number of photographs used by officers in a photo array, the closer the array must be scrutinized for suggestive irregularities."); *United States v. Brown*, 471 F.3d 802, 804 (7th Cir. 2006) ("[T]he single photo or one-person showup implies that the police have their man and suggests that the witness give assent. Suggestibility is one of the principal ways in which memory plays tricks and leads to improper identifications."); *United States v. Al-Farekh*, 956 F.3d 99, 111–12 (2d Cir. 2020) (noting that a photo array consisting of "a very small number of photographs, which are in turn presented in a manner that suggests to the witness that a specific person may be the suspect" is unduly suggestive).

Though we are aware of the significant body of caselaw that looks askance at the propriety of single-photo identification procedures,[2] we need not definitively

---

[2]     In addition to the cases already cited *supra*, for example, *see United States v. Edwards*, 34 F.4th 570, 581 (7th Cir. 2022), *cert. denied*, --- U.S. ----, 143

opine on the suggestiveness of Officer Spencer's procedure to resolve Mr. Johnson's challenge. We assume without deciding that Officer Spencer's procedure here was unduly suggestive. *Cf. United States v. Fortune*, 216 F.3d 1088 (tbl.), 2000 WL 703332, at *5 (10th Cir. 2000) (unpublished) ("assum[ing] without deciding that the identification technique . . . was unnecessarily suggestive" when officers drove victims to two suspects, who were handcuffed in police cars, shortly after a robbery).[3] But we nevertheless conclude that Mr. Johnson's challenge cannot prevail because Ms. Slagle's identification was sufficiently reliable.

**3**

Ordinarily, courts consider the reliability of an eyewitness identification in the context of "a witness observing and subsequently identifying a *stranger*." *Moss v. Hofbauer*, 286 F.3d 851, 862 (6th Cir. 2002); *see also Manson*, 432 U.S. at 112 ("Usually the witness must testify about an encounter with a total *stranger* under circumstances of emergency or emotional stress. The witness' recollection of the

---

S. Ct. 307 (2022) (mem.) (concluding that an officer's "[p]resent[ation] [of] . . . only one suspect [to a witness] for an identification [was] inherently suggestive" but nevertheless "may be permissible in certain circumstances"); *Stansbury v. Wertman*, 721 F.3d 84, 90 (2d Cir. 2013) (concluding that the use of a single photo array was unduly suggestive and akin to a single suspect show-up); *cf. O'Neil*, 62 F.4th at 1288 n.9 (noting that the record "amply support[ed]" the district court's determination that a show-up identification technique was suggestive when the defendant was the only suspect shown to the witness).

[3]    We rely herein on certain unpublished decisions. We recognize that these unpublished decisions are not binding; they aid us only insofar as they are persuasive. *See, e.g.*, *Bear Creek Trail, LLC v. BOKF, N.A.*, 35 F.4th 1277, 1282 n.8 (10th Cir. 2022); *see also* FED. R. APP. P. 32.1; 10TH CIR. R. 32.1(A).

*stranger* can be distorted easily by the circumstances or by later actions of the police." (emphases added)); *United States v. Wade*, 388 U.S. 218, 228 (1967) (noting that "[t]he identification of *strangers* is proverbially untrustworthy" (emphasis added) (citation omitted)).

Where a witness has some familiarity with a suspect, however, courts have recognized that the existing acquaintanceship supports a finding of reliability—apart from the five *Biggers* factors. *See Haliym v. Mitchell*, 492 F.3d 680, 706 (6th Cir. 2007) ("Witnesses are very likely to recognize under *any* circumstance the people in their lives with whom they are most familiar, and *any* prior acquaintance with another person substantially increases the likelihood of an accurate identification." (emphases added)); *United States v. Burgos*, 55 F.3d 933, 942 (4th Cir. 1995) ("Here, because the witnesses knew [the defendant] personally, the chance of misidentification from a concededly suggestive photo display is virtually non-existent. These witnesses' in-court identifications of [the defendant] were based on far more than a brief glimpse, five minutes of study, or an overly suggestive photograph display. In fact, every indication is that all four witnesses could have identified [the defendant] just as easily had they not seen the photographs."); *see also United States v. Osorio*, 757 F. App'x 167, 170 (3d Cir. 2018) (determining that the concern that "[t]he identification of strangers is proverbially untrustworthy" was not implicated because "th[e] case involved police showing surveillance photographs to a person already familiar with the identified suspect" (first alteration in original)

(quoting *Wade*, 388 U.S. at 228));[4] Nathan R. Sobel, et. al, EYEWITNESS

IDENTIFICATION: LEGAL & PRACTICAL PROBLEMS § 6:6 (2d. ed), Westlaw (database

updated Apr. 2024) ("Even though neither [the Supreme Court's decisions in]

*Biggers* nor *Brathwaite* specifically mentioned prior acquaintance as a factor of

reliability, many cases have considered it in their analyses.  [Such] recognition . . . is

a common basis for upholding an identification.").

Here, in determining that the "indicators of the reliability of Ms. Slagle's

identification are hardly outweighed by any suggestive effect of the challenged

identification itself," the district court highlighted Ms. Slagle's prior knowledge of

Mr. Johnson and the time that she spent with him at her apartment on the night of the

alleged assault.  Aplt.'s App., Vol. IV, at 148.  The court was right to emphasize

---

[4]    Federal district courts have been inclined to this view as well.  *See, e.g.*, *United States v. Robertson*, No. 17-cr-02949, 2020 WL 85134, at *10 (D.N.M. Jan. 7, 2020) (unpublished) (finding that a witness's "apparent familiarity with [the defendant] prior to the shooting" supported reliability); *Bell v. Epps*, No. 3:04-cv-212, 2008 WL 2690311, at *16 (N.D. Miss. June 20, 2008) (unpublished), *aff'd*, 347 F. App'x 73 (5th Cir. 2009) (distinguishing between a case where the witness "knew of [the defendant] through their mutual friends" before they met and "spent several hours with [the defendant] on the day [that] they met," and "a case where a witness met a defendant on the street in passing with no indication that his identification of this stranger would later be important"); *Hernandez v. Artus*, No. 09-cv-05694, 2020 WL 2769404, at *13 (E.D.N.Y. May 28, 2020) (unpublished) (finding that, although "'identification of strangers is proverbially untrustworthy,' [t]he trial and pre-trial record d[id] not warrant these concerns" because the witness knew the defendant (quoting *Wade*, 388 U.S. at 228)); *Brown v. Kernan*, No. C-06-04194, 2009 WL 2030347, at *10 (N.D. Cal. July 9, 2009) (unpublished) (finding that "the risk of possible misidentification was low because . . . the two witnesses were acquainted with [the defendant] from previous drug-related encounters and could recognize him more readily than if he had been a stranger").

21

these facts.[5]  Indeed, along with her boyfriend, Ms. Slagle "had on at least one prior occasion socialized with" Mr. Johnson and his girlfriend.  Aplt.'s App., Vol. I, 47–48 ¶ 38.  Her relationship with Mr. Johnson was strong enough that Ms. Slagle invited Mr. Johnson to "go have a drink" the evening of the alleged assault.  *Id.*  And before going to two local bars together, Ms. Slagle and Mr. Johnson went to Ms. Slagle's apartment, where she left him alone in her living room while she searched for personal items.  The two also smoked marijuana and drank wine together in her home.  Moreover, Ms. Slagle allowed Mr. Johnson to drive her car.

Put simply, this case does not concern "an encounter with a total stranger under circumstances of emergency or emotional stress."  *Manson*, 432 U.S. at 112; *Moss*, 286 F.3d at 862 ("[T]he witness who testified that she observed [the defendant] shoot [the

---

[5]    Mr. Johnson argues that these facts—which the district court mentioned concerning Ms. Slagle's prior knowledge of Mr. Johnson and the time that she spent with him on the night of the alleged assault—are "immaterial to the question of what Defendant Spencer knew as of the time he confronted Ms. Slagle with an identification or driver's license photo of Mr. Johnson.  That confrontation did not achieve an uncorrupted, truthful result."  Aplt.'s Opening Br. at 49 n.9 (citing Aplt.'s App., Vol. IV, at 148).  Contextualized in his brief, this argument appears to be advanced to bolster Mr. Johnson's contentions regarding the alleged lack of suggestiveness of Officer Spencer's photo procedure.  *See id.* at 49 (noting that, as a consequence of asking "[o]ffender physical description questions," "[s]uggestibility is minimized").  As such, the argument is both unnecessary and misdirected.  It is unnecessary because, for purposes of resolving this appeal, we are assuming without deciding that Officer Spencer's photo procedure *was* unduly suggestive.  And it is misdirected because the court was highlighting the facts at issue to support its reliability ruling, not to comment on whether Officer Spencer's photo procedure was suggestive.  And it is this latter issue that appears to be the focus of Mr. Johnson's argument.  Indeed, the nature of Officer Spencer's subjective knowledge would seemingly be wholly irrelevant to the question of whether Ms. Slagle's identification was sufficiently reliable.

22

victim], saw him on a daily basis as a person in the neighborhood. This case is simply not the 'stranger who jumps out of the dimly lit alley' situation that would raise reasonable doubts about [the witness's] perception."). Rather, Ms. Slagle was familiar with Mr. Johnson, and that familiarity alone is sufficient under these facts to overcome any suggestiveness associated with the identification procedure.[6]

**4**

The *Biggers* factors do not counsel toward a different outcome. *See* 409 U.S. at 199–200. First, Ms. Slagle stated that she had a clear opportunity to view and recognize Mr. Johnson during the alleged assault. *See O'Neil*, 62 F.4th at 1288 (finding that the first *Biggers* factor was satisfied because the victims could see the defendant from a short distance); *see also United States v. Maxwell*, 492 F. App'x 860, 867 (10th Cir. 2012) (concluding that the fact that the witness could see the defendant's face "very plain and very clear" supported a finding of reliability).

Moreover, Ms. Slagle knew Mr. Johnson before the alleged assault and spent several hours with him that night; therefore, she was familiar with his physical characteristics. *See United States v. Worku*, 800 F.3d 1195, 1205 (10th Cir. 2015)

---

[6]    It is undisputed that Ms. Slagle falsely accused Mr. Johnson and her then-boyfriend corroborated the deception. This is monstrous, leading to an unjust twenty-four-year term in prison. But, that we *now* know Ms. Slagle lied about the identity of her assailant is not material to our analysis because the question is whether the trial court could be said to have violated Mr. Johnson's due process rights *at trial* by admitting identification testimony that did not bear sufficient indicia of reliability. Put in other words, we do not conduct this inquiry with the benefit of hindsight; rather, we examine the indicia of reliability as they appeared to the trial court at the time.

23

(upholding the reliability of an identification by witnesses who saw the defendant "regularly over lengthy time spans"); *Kamahele*, 748 F.3d at 1021 (determining that identifications were reliable, in part, because "two of the employees testified that they had recognized [the defendant] as someone who had previously visited the store" before robbing it); *see also United States v. Sierra*, 390 F. App'x 793, 798 (10th Cir. 2010) (concluding that "the informant had a number of opportunities to view [the defendant] engaging in criminal activity [because] she obtained methamphetamine from him on several occasions").

Second, Ms. Slagle's reaction to the intruder in her apartment suggests that her attention would have been focused on Mr. Johnson. Ms. Slagle's neighbor testified at Mr. Johnson's criminal trial that she heard "a woman's muffled, high-pitched scream sounding something like 'no, no.'" Aplt.'s App., Vol. I, at 39 ¶ 18. Ms. Slagle's focus certainly would not have been elsewhere. *See Thody*, 978 F.2d at 629 (concluding that there was "no question that the attention of [the witnesses] was riveted on [the robbers]" during two different robberies).

Third, Ms. Slagle identified her assailant as "A.J." prior to Officer Spencer showing her Mr. Johnson's driver's license. Aplt.'s App., Vol. I, at 42 ¶ 24. Therefore, because she named Mr. Johnson by his initials before seeing his driver's license, she appeared to have accurately identified her attacker before viewing any potentially suggestive photograph. Under these circumstances, there would have been little risk of misidentification. *Cf. Archuleta v. Kerby*, 864 F.2d 709, 712 (10th

24

Cir. 1989) (observing that the witnesses' accurate description of the defendant demonstrated the reliability of their identification).

Fourth, Ms. Slagle appeared confident in her identification; the complaint alleges that she said to Officer Spencer, "[y]es, that's A.J.," without any equivocation.  Aplt.'s App., Vol. I, at 42 ¶ 24.  Such an unequivocal identification can suggest that the identification is reliable.[7]  *See Archuleta*, 864 F.2d at 712 (concluding that two witnesses that were "unequivocal at all times" were reliable); *United States v. Bredy*, 209 F.3d 1193, 1197 (10th Cir. 2000) (noting that "three witnesses identified [the] [d]efendant immediately and without hesitation").

Fifth and finally, Ms. Slagle identified Mr. Johnson as her assailant only minutes after the assault occurred, further suggesting reliability.  *See Archuleta*, 864 F.2d at 712 ("[T]he [witnesses] identified Archuleta approximately thirty minutes after the crime.  This is a very short interval of time, which adds to the reliability of the identification."); *Bredy*, 209 F.3d at 1197 (determining a witness that identified the defendant about thirty minutes after a robbery was reliable); *cf. Kamahele*, 748 F.3d at 1021 (finding an identification three months after a robbery reliable).

Accordingly, an analysis of the *Biggers* factors supports the outcome that we reach here.

\*    \*    \*

---

[7]    We recognize, however, that "there will not always be clear correlation between witness confidence and accuracy."  *O'Neil*, 62 F.4th at 1289 n.13.

In sum, even if we assume that Officer Spencer's identification procedure

"was unnecessarily suggestive, 'the degree of suggestiveness . . . [is] . . . easily

outweighed by sufficient evidence of reliability.'" *United States v. Berryhill*, 880

F.2d 275, 280 (10th Cir. 1989) (quoting *Baca v. Sullivan*, 821 F.2d 1480, 1482 (10th

Cir. 1987)).  In light of the totality of the circumstances surrounding Ms. Slagle's

identification of Mr. Johnson, we conclude that there was not a "substantial

likelihood of irreparable misidentification."  *Id.* (quoting *Simmons v. United States*,

390 U.S. 377, 384 (1968)).

Accordingly, we conclude that Mr. Johnson has failed to allege a constitutional

violation.  And because this is so—without any need to reach the question of clearly

established law—we may conclude that Mr. Johnson cannot overcome Officer

Spencer's defense of qualified immunity.  *See A.M.*, 830 F.3d at 1134–35.

**B**

We next resolve whether the district court erred in granting summary judgment

to Officer Spencer and Detective Stanford on Mr. Johnson's *Brady* and

*Trombetta*/*Youngblood* claims.  Mr. Johnson asserts that Defendants violated his due

process rights by failing to produce and/or preserve photographs of the interior of

Ms. Slagle's apartment taken by Officer Raybuck.[8]

---

[8]   Mr. Johnson appears to chide the district court for its analytic approach
to his claims predicated on the alleged suppression and/or failure to preserve
exculpatory evidence: "The Summary Judgment Order does not draw distinctions
among the doctrines, lumping them together as '*Brady*/*Trombetta*/*Youngblood*
claims,' which the court first rejected based upon its ruling that Mr. Johnson failed to
show that any discoverable evidence existed in the first instance."  Aplt.'s Opening

The district court found that Mr. Johnson presented no evidence that the allegedly missing photographs ever existed.  In the alternative, the district court effectively assumed that the photographs existed and determined that Mr. Johnson failed to show that the missing photographs were material and exculpatory.  In this regard, the court offered the following reasoning: "[E]ven a reasonable inference that [Officer] Raybuck took additional photos does not support a further inference that the additional photos depicted the apartment's interior, or anything in particular in the apartment."  *Johnson*, 2022 WL 1050648, at *8.  And more to the point, the court continued: "Even if the Court could reasonably infer [Officer] Raybuck took additional photos of the apartment interior that were neither produced nor preserved, whether such photos depicted something that would have been both favorable and material to [Mr.] Johnson's defense is a matter of further speculation."  *Id.* at *9.  Furthermore, the court determined that Mr. Johnson "failed to put forth evidence establishing the Defendants acted in bad faith."  *Id.* at *11.

Alternatively, noting that § 1983 liability must rest on a showing that the defendants personally participated in the alleged unlawful conduct and that they did so with a mental state surpassing negligence—that is, acting at least knowingly or recklessly—the court determined that "there is no evidence the Individual Defendants

---

Br. at 35 (citing *Johnson*, 2022 WL 1050648, at *7–9).  However, Mr. Johnson himself does not clearly draw lines of demarcation between his arguments regarding these separate due process doctrines.  For example, he does not devote separate sections of his brief to his discussion of the three doctrines.  For analytical precision, however, we do separately examine these doctrines in separate portions of this opinion.

participated in any violation of [Mr.] Johnson's constitutional rights, let alone did so knowingly or recklessly." *Id.* at \*12. On this independent basis alone, the court concluded that Officer Spencer and Detective Stanford would prevail on their qualified immunity defense.

On appeal, Mr. Johnson argues that the district court was "required to draw the reasonable inference in [his] favor that the additional photographs indeed were taken at the crime scene." Aplt.'s Opening Br. at 44. Mr. Johnson also contends that the unproduced photographs were exculpatory—or at the very least, potentially useful to his defense—and they were either suppressed or destroyed in bad faith. [9] For this and related reasons, Mr. Johnson contends that the court erred in granting Officer Spencer and Detective Stanford qualified immunity.

---

[9] Mr. Johnson argues that the district court's failure to "draw the reasonable inference in [his] favor that the additional photographs indeed were taken at the crime scene" sounds the death knell for the qualified immunity defense of Officer Spencer and Detective Stanford. Aplt.'s Opening Br. at 44; *see also id.* at 21 ("The assumption that no such [additional, crime-scene photographic] evidence existed was the linchpin of the district court's summary judgment ruling, and the existence of conflicting facts and inferences invalidate that ruling."). We disagree. We examine the summary judgment record de novo in this qualified immunity context and, as such, we need not parse the district court's analysis regarding the inferences it did or did not draw in Mr. Johnson's favor. *See, e.g.*, *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 758 n.5 (10th Cir. 2021) ("[T]o the extent that the gravamen of Plaintiffs' concern is actually that the district court did not properly construe material disputed facts in its favor, we underscore that our review is de novo, and we need not defer to the district court's performance of this task."). More fundamentally, for purposes of our analysis, as noted *infra*, we assume without deciding that there was sufficient evidence to establish that additional, crime-scene photographs did exist and were destroyed or otherwise misplaced.

We conclude that the district court properly rejected Mr. Johnson's claims under *Brady*, *Trombetta*, and *Youngblood*. In doing so, we assume without deciding that there was sufficient evidence to demonstrate that additional, crime-scene photographs did exist and were destroyed or otherwise misplaced.[10] However, we conclude that Mr. Johnson has failed to show that the photographic evidence was material for purposes of *Brady*, or that (among other things) its exculpatory value was apparent for purposes of *Trombetta* or that it was destroyed in bad faith in satisfaction of the *Youngblood* standard. Furthermore, if that were not enough, we agree with the district court's determination that Mr. Johnson has not demonstrated that Officer Spencer or Detective Stanford personally violated his constitutional rights with respect to the suppression or destruction of the photographs—let alone

---

[10] In order to resolve Mr. Johnson's claims, we need not definitively opine on whether sufficient evidence exists to support the conclusion that additional, crime-scene photographs existed. However, we observe that Mr. Johnson's position is not without support in the record, which validates our decision to at least assume without deciding that additional photographs—including of the crime scene—did exist. In this regard, Mr. Johnson points to Officer Raybuck's testimony, during which he acknowledged that certain photographs were missing from the film strip. *See, e.g.*, Aplt.'s App., Vol. V, at 177:15–23 (Dep of Officer Raybuck, dated Nov. 3, 2021) ("Q: In regard to the photographs that you took that are in Row Number 1 of Exhibit B, there is not a flash card either at the beginning or at [the] end of those negatives. Isn't that true? A: That's true. Q: And your practice in June of 1989 would have been to have had the flash card at the beginning of the series and at the end of the series. Is that true? A: True."). We further note that Mr. Johnson cites expert testimony, which suggests that a reasonable officer in Officer Raybuck's position would have taken photographs "of the bathroom area where the assault allegedly occurred, in the bedroom area, in the living room, and throughout the apartment." *Id.*, Vol. IV, at 270 (Chris Bertram's Expert Rep., filed Jan. 13, 2022).

violated his rights knowingly or recklessly. Accordingly, on this basis alone, his § 1983 claims must fail.

**1**

"The Supreme Court's jurisprudence divides cases involving nondisclosure of evidence into two distinct universes." *Fero v. Kerby*, 39 F.3d 1462, 1472 (10th Cir. 1994). At one end, *Brady* "address[es] exculpatory evidence still in the government's possession." *Id.* At the other end, *Youngblood* and *Trombetta* "govern cases in which the government no longer possesses the disputed evidence." *Id.*

Under *Brady* and its progeny, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87. "To prevail on a *Brady* claim, the proponent must show that '(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material.'" *Goode v. Carpenter*, 922 F.3d 1136, 1149 (10th Cir. 2019) (quoting *United States v. Ford*, 550 F.3d 975, 981 (10th Cir. 2008)). "[E]vidence is 'material' . . . when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469–70 (2009) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

Under *Trombetta*, "due process . . . impose[s] a duty upon the government to preserve evidence . . . 'that might be expected to play a *significant* role in the suspect's defense.'" *United States v. Ludwig*, 641 F.3d 1243, 1253 (10th Cir. 2011)

30

(emphasis added) (quoting *Trombetta*, 467 U.S. at 488–89).  "To qualify as constitutionally material in this sense, the evidence must: (1) 'possess an exculpatory value that was apparent [to the police] before the evidence was destroyed,' and (2) 'be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'"  *Id.* (alteration in original) (quoting *Trombetta*, 467 U.S. at 489).  Additionally, (3) "if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was 'potentially useful' for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence."  *United States v. Bohl*, 25 F.3d 904, 910 (10th Cir. 1994) (quoting *Youngblood*, 488 U.S. at 58).

**2**

**a**

We first turn to Mr. Johnson's *Brady* claim.  In part, the district court reasoned that—even assuming the additional photographs existed—Mr. Johnson failed to demonstrate that the photographs would have been material.  We agree.[11]

---

[11]     Mr. Johnson makes a limited *Brady* argument, which primarily centers on whether the allegedly withheld crime-scene photographs were material.  *See* Aplt.'s Opening Br. at 43–44.  However, notably, Mr. Johnson never asserts in his appellate briefing that anyone in the City's law enforcement actually possessed the photos at the time of his trial.  In light of his *Trombetta* and *Youngblood* claims, Mr. Johnson necessarily is asserting that at some point in time the photos were destroyed or lost.  If this occurred before his trial, then the government would not have possessed them at trial and could not be said to have committed a *Brady* violation by suppressing them.  *See United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009) ("A *Brady* claim fails if the existence of favorable evidence is merely suspected.  That the evidence exists must be established by the defendant.");  *cf. United States v. Harry*, 816 F.3d 1268, 1276 (10th Cir. 2016) (noting the *Trombetta*

To establish materiality under *Brady*, Mr. Johnson bears the burden of showing that "there is a reasonable probability that, had the [alleged photographs] been disclosed, the result of the proceeding would have been different." *Cone*, 556 U.S. at 469–70. Put differently, Mr. Johnson must show that the photographs were "subject to constitutionally mandated disclosure [because they] 'could reasonably [have] be[en] taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* at 470 (quoting *Kyles*, 514 U.S. at 435).

Mr. Johnson has made no such showing. He hypothesizes that the additional photographs of Ms. Slagle's apartment would have provided him with impeachment evidence—*viz.*, photographs of his driver's license and identification card on the

---

standard was applicable where "Defendant made the requisite request [before trial for allegedly exculpatory evidence], but the evidence was no longer available at that time"). This is true because *Brady* is a trial right—that is, a violation arises when the government does not provide the defense with material exculpatory evidence in its possession for use at trial. *See, e.g.*, *Smith v. Sec'y of New Mexico Dep't of Corr.*, 50 F.3d 801, 823 (10th Cir. 1995) ("The essence of the *Brady* rule is the proposition that nondisclosure of material exculpatory evidence violates a defendant's due process right to a fair trial."); *see also United States v. Battles*, 745 F.3d 436, 446 (10th Cir. 2014) ("Because *Brady* is a trial right, at least in the sense that the materiality of any suppressed evidence is evaluated as of the time of trial, if Ms. Battles had obtained the information upon which she presently grounds her *Brady* claim before the trial commenced (or, indeed, sometime before the trial ended), she would have been obliged to voice her concerns about that potentially suppressed information *then*." (citations omitted)). Stated otherwise, Mr. Johnson makes no assertion that would indicate that he has carried his burden of proof as to the first—suppression element— of his *Brady* claim. Because the district court took the position—contrary to the assumption that we make here, *see, e.g.*, *supra* notes 9–10, that there was an "absence of evidence that additional apartment photos *ever* existed," *Johnson*, 2022 WL 1050648, at *8—there was no occasion for the court to inquire about the implications for Mr. Johnson's *Brady* argument of the loss of the additional crime-scene photos before trial, and the Defendants do not draw this temporal distinction in their *Brady*-related arguments either. Accordingly, we do not pursue the matter further.

coffee table in the living room would have allegedly served to impeach the testimony of Officer Spencer who testified that he found them on the floor near the bathroom. However, ultimately, the location of Mr. Johnson's driver's license and identification card would have had little bearing on his ultimate conviction and thus cannot be deemed material under *Brady*. *Cf. United States v. Trujillo*, 136 F.3d 1388, 1393 (10th Cir. 1998) ("Impeachment evidence certainly falls within the *Brady* rule. However, the failure to disclose impeachment evidence does not require automatic reversal, even where, as here, the prosecution's case depends largely on the credibility of a particular witness. The court still must find the evidence material." (citations omitted)).

The evidence of guilt—even though years later found to be based on lies—must have seemed overwhelming to the jury at Mr. Johnson's trial. Specifically, the evidence showed that (1) Mr. Johnson and Ms. Slagle were together on the night of the assault, (2) Mr. Johnson's driver's license and identification card were found at Ms. Slagle's apartment, (3) Mr. Johnson's eyeglasses were also found at the apartment, (4) Ms. Slagle identified Mr. Johnson as the perpetrator shortly after the assault (and further confirmed her identification in subsequent interviews with law enforcement), (5) Ms. Slagle testified at length that Mr. Johnson raped her, and (6) both Ms. Slagle and her then-boyfriend testified that the then-boyfriend was out of town at the time of the assault.

In view of this evidence of guilt, the notion that photographs showing Mr. Johnson's driver's license and identification card in the living room—assuming

33

that the additional photographs depicted this—would have tipped the balance at trial because of their impeachment value is mere fanciful speculation and insufficient to establish a *Brady* violation. *See Fontenot v. Crow*, 4 F.4th 982, 1074 (10th Cir. 2021) (noting that "[m]ere speculation that the evidence [would] [have] be[en] favorable is insufficient" to establish a *Brady* violation); *United States v. Holloway*, 939 F.3d 1088, 1105 (10th Cir. 2019) (concluding that the defendant failed to establish a *Brady* claim when "he [could] []not evaluate favorability because he ha[d] not seen" the allegedly exculpatory evidence); *United States v. Acosta-Gallardo*, 656 F.3d 1109, 1117 (10th Cir. 2011) (concluding that the defendant failed to establish a *Brady* violation when "no one kn[ew] whether the [evidence] would have been favorable" to the defendant); *see also Pippin v. Dretke*, 434 F.3d 782, 789 n.7 (5th Cir. 2005) ("A claim that is largely speculative with respect to the effect of the allegedly exculpatory evidence on the jury's ultimate determination of guilt or innocence cannot support a *Brady* violation."). Thus, we hold that the district court correctly rejected Mr. Johnson's *Brady* claim.

**b**

We next turn to Mr. Johnson's *Trombetta*/*Youngblood* claim. Specific to *Trombetta*, the district court concluded that Mr. Johnson failed to explain how the exculpatory value of the missing photographs would have been apparent to the officers—thereby, effectively ruling against him on this point because he failed to carry his burden of proof. Further, the court determined that Mr. Johnson failed to

34

establish that he could not have obtained comparable evidence by other reasonable means.

The government's duty to preserve evidence, under the Due Process Clause, extends "to evidence that might be expected to play a significant role in the suspect's defense." *Trombetta*, 467 U.S. at 488. Under *Trombetta*, the government violates a defendant's due process rights when "evidence . . . possess[es] an exculpatory value that was apparent before the evidence was destroyed, *and* [was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489 (emphasis added). We assess whether evidence possessed apparent exculpatory value before it was destroyed from the perspective of what the officers knew that the time that they encountered the evidence. *See United States v. Harry*, 816 F.3d 1268, 1277 (10th Cir. 2016) ("[W]e must view the [allegedly exculpatory text] message in light of what Investigator Joe knew when he saw it."). "In most instances," as a well-known treatise has observed, "the character of the evidence and its potential impact will be unclear." 6 Wayne R. LaFave, et al., CRIMINAL PROCEDURE § 24.3(e) (4th ed.), Westlaw (database updated Dec. 2023).

We review the district court's ruling on whether the evidence bore apparent exculpatory value for clear error. *See United States v. Ray*, 899 F.3d 852, 863 (10th Cir. 2018); *see also United States v. Hargus*, 128 F.3d 1358, 1364 (10th Cir. 1997); *Bohl*, 25 F.3d at 909. Under the clear error standard, we may not reverse "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety . . . even [if] . . . had [we] been sitting as the trier of fact, [we] would have

35

weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985); *see United States v. Torres*, 53 F.3d 1129, 1144 (10th Cir. 1995) ("To constitute clear error, we must be convinced that the . . . court's finding is simply not plausible or permissible in light of the entire record on appeal, remembering that we are not free to substitute our judgment for that of the district judge."). Indeed, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574; *see United States v. Ellis*, 23 F.4th 1228, 1241 (10th Cir. 2022) ("This is a 'deferential' standard." (quoting *United States v. Nkome*, 987 F.3d 1262, 1276 (10th Cir. 2021))). On this question of the apparent exculpatory value of the evidence, Mr. Johnson bears the burden of proof. *See Harry*, 816 F.3d at 1276; *Ray*, 899 F.3d at 863; *see also United States v. Hartman*, 194 F. App'x 537, 541 (10th Cir. 2006).

We conclude that the district court did not clearly err in ruling against Mr. Johnson on this question. At the outset, though we are prepared to assume without deciding that there was sufficient evidence to establish that the additional, crime-scene photographs did exist and were destroyed or otherwise misplaced— absent specific, supportive evidence—we will not go a step further and infer that those photos captured any particular images, including images of Mr. Johnson's driver's license and identification card on or about the coffee table. To do so would be to engage in pure speculation and conjecture, and that we will not do. *See, e.g., Pioneer Cntrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017) ("The district court must draw all reasonable

36

inferences in favor of the nonmoving party.  But an inference is unreasonable if it requires 'a degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere possibility.'" (alteration in original) (citation omitted) (quoting *United States v. Bowen*, 527 F.3d 1065, 1076 (10th Cir. 2008))); *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."); *see also Thomson*, 584 F.3d at 1312 ("[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record . . . .").

Furthermore, as the district court stated, Mr. Johnson does not explain what circumstances would have led Officer Spencer and Detective Stanford—or any experienced investigator for that matter—to be alerted to his theory regarding the exculpatory value of the photos, that is, his theory that the photos' depiction of the location of Mr. Johnson's driver's license and identification card could be used to impeach testimony that these items were found on the floor near the bathroom.  For example, Mr. Johnson has not suggested that he alerted anyone in the Cheyenne Police Department to his belief that those additional photographs possessed exculpatory value.

Significantly, the court reasoned that "in light of what Defendants Spencer and Stanford knew at the time they were investigating the crime," they "did not have any reason to believe photos of the apartment interior would be in any way *exculpatory* to Johnson, particularly in light of other evidence against him."

37

*Johnson*, 2022 WL 1050648, at \*10.  The court noted that the information that the officers had received from Ms. Slagle and Mr. Johnson would not have led them to believe that Mr. Johnson had smoked marijuana (and drank wine) with Ms. Slagle in her apartment.  *See id.*  More specifically, that information would not have led them to believe that Mr. Johnson had an independent reason to remove his driver's license and identification card and leave them on or around the coffee table in Ms. Slagle's living room.  *See id.*

The court's reasoning in this regard is more than plausible; it is firmly grounded in the record.  There is no mention of Ms. Slagle and Mr. Johnson smoking marijuana (or drinking wine) in either Officer Spencer's or Detective Stanford's contemporaneous notes.  *See* Aplt.'s App., Vol. VII, at 59 (Officer Spencer's Notes, dated June 11, 1989); *id.* at 68 (Detective Stanford's Notes, dated June 13, 1989).  Further, Ms. Slagle did not mention engaging in this activity with Mr. Johnson on or about her coffee table in the interior of her apartment during her official statement to the Cheyenne Police Department.  *See id.* at 71 (Ms. Slagle's Statement, dated June 11, 1989).  Indeed, to the contrary, Ms. Slagle stated that she and Mr. Johnson spent "about ten minutes at the most" in her apartment and that Mr. Johnson did not move out of the chair—noting that she "kept watching him because [she] d[idn't] trust him really when it c[a]me to her property."  *Id.* at 131.  And though the record shows that Mr. Johnson denied involvement in the sexual assault before he was given *Miranda* warnings, *see id.* at 65 (Officer Raymond Bilkie's Rep., dated June 11, 1989), there is no indication that Mr. Johnson discussed smoking marijuana (or drinking wine) with

38

Ms. Slagle in her apartment with investigators or, more to the point, that he gave investigators any reason to believe that he left his driver's license and identification card in Ms. Slagle's apartment because he was involved in some activity there unrelated to any sexual assault on Ms. Slagle. In short, we would be hard pressed to conclude that the district court's ruling against Mr. Johnson concerning whether the evidence bore apparent exculpatory value is clearly erroneous. Consequently, we "need not address" the question of whether Mr. Johnson "lacked access to comparable evidence." *Ray*, 899 F.3d at 864.

However, even electing to do so, we conclude that Mr. Johnson has not demonstrated that such photographic evidence was of a nature that he could not secure comparable evidence through reasonably available means. This in itself is a sufficient basis to reject his *Trombetta* claim. *See Ludwig*, 641 F.3d at 1254 (noting that the defendant's *Trombetta* claim "falters at the second step of this test"). For instance, Mr. Johnson could have cross-examined Ms. Slagle and Officer Spencer to adduce information regarding what the missing photographs would have shown. *See Trombetta*, 467 U.S. at 490 (noting that "the right to cross-examine the law enforcement officer" was an adequate alternative for the destroyed evidence); *Ludwig*, 641 F.3d at 1254 (noting that the defendant "enjoyed at least one other means for obtaining comparable evidence—namely, by calling and questioning the witnesses to the event at his suppression hearings"); *see also United States v. Cayatineto*, 49 F. App'x 278, 283 (10th Cir. 2002) (rejecting the defendant's *Trombetta*/*Youngblood* claim because he "had ample opportunity to cross-examine

39

both [the officer] and the . . . investigator who took the photographs, both of whom possessed knowledge [of the incident in question]"). Accordingly, the district court did not err in determining that Mr. Johnson's *Trombetta* claim fails.

Because the "exculpatory value of the evidence is indeterminate and all that can be [said] is that the evidence [may have been] 'potentially useful'" to Mr. Johnson, we now analyze his claim under *Youngblood*. *Bohl*, 25 F.3d at 910 (quoting *Youngblood*, 488 U.S. at 58). To establish a constitutional violation under *Youngblood*, Mr. Johnson has the burden to show "that the government acted in bad faith in destroying the evidence." *Id.*; *see Harry*, 816 F.3d at 1276; *United States v. Richard*, 969 F.2d 849, 853 (10th Cir. 1992).

The district court concluded that the record was devoid of such evidence of bad faith. We review the district court's bad faith determination for clear error. *See Bohl*, 25 F.3d at 909 ("The inquiry into allegations of prosecutorial bad faith presents a mixed question of fact and law in which 'the quintessential factual question of intent' predominates." (quoting *Richard*, 969 F.2d at 853)). We detect no error—let alone clear error—in the court's finding regarding the lack of bad faith.

Mr. Johnson points to no evidence showing that Officer Spencer or Detective Stanford had any bad-faith motivations to destroy the additional photographs, let alone that they—or anyone else in the police department—actually destroyed them in bad faith.

In an apparent attempt to shift his burden to the government, Mr. Johnson argues that the government did not offer an "innocent explanation" for the

destruction of evidence. Aplt.'s Opening Br. at 40 (quoting *Bohl*, 25 F.3d at 912).

To be sure, the "[a]bsence of an innocent explanation for the loss [of evidence]

can . . . point to bad faith." *Harry*, 816 F.3d at 1279. But "[t]he mere fact that the

government controlled the evidence and failed to preserve it is by itself insufficient

to establish bad faith." *Id.* (alteration in original) (quoting *Richard*, 969 F.2d at 853–

54); *see also Bohl*, 25 F.3d at 912 ("[M]ere negligence on the government's part in

failing to preserve such evidence is inadequate for a showing of bad faith."). Such is the

case here.

Mr. Johnson relies on our opinion in *Bohl*. That case is indeed instructive, but

it is not helpful to Mr. Johnson. In *Bohl*, we considered whether the government

destroyed evidence in bad faith after the defendants notified the government of its

potentially exculpatory nature and repeatedly requested to inspect the evidence. *See*

25 F.3d at 911. We considered five factors in determining whether the government

destroyed the evidence in bad faith: (1) whether the government was placed on notice

of the potentially exculpatory value of the evidence; (2) whether the assertion that the

evidence was potentially exculpatory was supported by objective, independent

evidence; (3) whether the government possessed the evidence at the time of the

notice; (4) whether the evidence was central to the government's case; and

(5) whether there was an innocent explanation for the government's failure to

preserve the evidence. *See id.* at 911–12; *see also Ray*, 899 F.3d at 864–65. Finding

each of these factors satisfied, we ultimately concluded that the government acted in

bad faith and violated the defendants' due process rights. *See Bohl*, 25 F.3d at 914.

But only the last of the five factors that *Bohl* identified—the lack of an innocent explanation for the government's failure to preserve the evidence—applies here. The other factors do not apply. First, Mr. Johnson did not put the government on notice of the potentially exculpatory value of the additional photographs. Second, as reflected in our discussion of Mr. Johnson's *Brady* and *Trombetta* claims, there was no objective evidence to suggest that the additional, crime-scene photos were potentially exculpatory. Third, even if Mr. Johnson had put the government on notice (and there is no evidence that he did so), Mr. Johnson has not shown that the government would have still possessed the photographs at the time of that hypothetical notice. Fourth, the evidence would not have been central to the case *against* Mr. Johnson: as we noted, *supra*, it would not have had a material impact on the outcome of his trial and, at most, would have been weak impeachment evidence aimed at undercutting the government's case. Accordingly, Mr. Johnson has not shown that the government acted in bad faith, and his *Youngblood* claim must fail.

**3**

Even if the foregoing analysis were not enough to doom Mr. Johnson's *Brady* and *Trombetta*/*Youngblood* claims (though it is), as the district court reasoned, Mr. Johnson has failed to make the requisite qualified-immunity showing that Officer Spencer and Detective Stanford had "*direct personal responsibility* for the claimed deprivation of [his] constitutional right[s]" under *Brady* or *Trombetta*/*Youngblood*. *Porro v. Barnes*, 624 F.3d 1322, 1327 (10th Cir. 2010) (quoting *Trujillo v. Williams*, 465 F.3d 1210, 1227 (10th Cir. 2006)); *see also Schneider v. City of Grand Junction Police*

*Dep't*, 717 F.3d 760, 768 (10th Cir. 2013) ("Individual liability under § 1983 must be based on [the defendant's] personal involvement in the alleged constitutional violation." (alteration in original) (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997))).  And, notably, even if Mr. Johnson were able to show some personal participation by the two (which he has not), he would need to show that they acted with the requisite mental state.  Specifically, because Mr. Johnson brings his claims under § 1983, he must show that Officer Spencer and Detective Stanford acted "with deliberate or reckless intent."  *Webber v. Mefford*, 43 F.3d 1340, 1343 (10th Cir. 1994); *see also Tiscareno v. Anderson*, 639 F.3d 1016, 1023 (10th Cir. 2011) ("[I]n a § 1983 context, all that is clearly established is that an investigator must not knowingly or recklessly cause a *Brady* violation."), *vacated in part on other grounds*, 421 F. App'x 842 (10th Cir. 2011); *cf. Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) ("[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.").[12]

---

[12]    *See also Porter v. White*, 483 F.3d 1294, 1308 (11th Cir. 2007) ("[M]ere negligence or inadvertence on the part of a law enforcement official in failing to turn over *Brady* material to the prosecution, which in turn causes a defendant to be convicted at a trial that does not meet the fairness requirements imposed by the Due Process Clause, does not amount to a 'deprivation' in the constitutional sense.  Thus, a negligent act or omission cannot provide a basis for liability in a § 1983 action seeking compensation for loss of liberty occasioned by a *Brady* violation."); *Montgomery v. Greer*, 956 F.2d 677, 681 (7th Cir. 1992) ("While the loss of the photographs was both 'unprofessional' and 'slip-shod,' [the plaintiff] made no showing that the police acted in bad faith in losing them.  At most, he has demonstrated that the officer was negligent, and mere negligence, without more, does not amount to a constitutional violation.").

Even drawing all inferences in Mr. Johnson's favor, he presents no evidence that Officer Spencer or Detective Stanford personally participated in any violation of Mr. Johnson's constitutional rights—let alone did so with the requisite mental state. As the district court noted, there is no reference to any additional photographs in either Officer Spencer's or Detective Stanford's police reports. And the only evidence that Mr. Johnson marshals is the expert testimony of a law enforcement official that "somebody had altered, recklessly misplaced, or intentionally removed those pictures from the case file." Aplt.'s App., Vol. V, at 258 (Pl.'s Resp. to Defs.' Mot. for Summ. J., filed Mar. 12, 2022) (quoting *id.*, Vol. IV, at 272 (Chris Bertram's Expert Rep., filed Jan. 13, 2022)). But that is merely a reiteration of the argument that *somebody* within the Cheyenne Police Department destroyed the photographs. It is not enough to show that either Officer Spencer or Detective Stanford was directly and personally responsible for the destruction of the missing photographs—much less that either one did so with the requisite mental state.

In sum, Mr. Johnson has failed to demonstrate that Officer Spencer or Detective Stanford—or anyone else at the Cheyenne Police Department for that matter—personally violated his constitutional rights, as defined by *Brady* and *Trombetta*/*Youngblood*. Accordingly, the district court correctly ruled in favor of Officer Spencer and Detective Stanford and granted them qualified immunity.

## C

We last turn to whether the district court erred in dismissing Mr. Johnson's § 1983 claims against the City of Cheyenne. Mr. Johnson "asserts that the City's

44

customs, or written policies or procedures (or lack thereof), regarding handling and disclosure of crime scene photos caused" the alleged violations of his constitutional rights under *Brady* and *Trombetta/Youngblood*.  Aplt.'s Opening Br. at 24.  We cannot agree.

"A municipality may not be held liable where there was no underlying constitutional violation by any of its officers."  *Wilson v. Meeks*, 98 F.3d 1247, 1255 (10th Cir. 1996) (quoting *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)); *see Trigalet v. City of Tulsa*, 239 F.3d 1150, 1156 (10th Cir. 2001) ("[A]bsent a constitutional violation by the individual police officers whose conduct directly caused plaintiffs' injuries, there can be no municipal liability . . . .").  "If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized [unconstitutional conduct] is quite beside the point."  *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam).

Mr. Johnson has failed to demonstrate that Officer Spencer or Detective Stanford—or any other person within the Cheyenne Police Department for that matter—violated his constitutional rights.  It therefore follows that his "§ 1983 municipal liability claim against the City necessarily fails."  *Est. of George v. City of Rifle*, 85 F.4th 1300, 1321 (10th Cir. 2023); *see also Crowson v. Washington Cnty.*, 983 F.3d 1166, 1186 (10th Cir. 2020) ("[A] claim under § 1983 against either an individual actor or a municipality cannot survive a determination that there has been no

45

constitutional violation."). Therefore, the district court correctly dismissed Mr. Johnson's § 1983 claim against the City of Cheyenne.

**IV**

The criminal justice system, "like any human endeavor, cannot be perfect," and "DNA evidence shows that it has not been." *Dist. Att'y's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 75 (2009). We recognize that the system's imperfection resulted in Mr. Johnson being wrongfully incarcerated for twenty-four years. But Mr. Johnson has failed to offer any evidentiary basis for his constitutional claims, and thus we are constrained to **AFFIRM** the district court's judgment.