FILED
**United States Court of Appeals**
**Tenth Circuit**

**March 17, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

<u>PUBLISH</u>

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

———————————————

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

STEVEN O'NEIL,

    Defendant - Appellant.

No. 22-2000

———————————————

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:19-CR-01832-JCH-1)**

———————————————

Jason Bowles of Bowles Law Firm, Albuquerque, New Mexico, for
Defendant – Appellant.

Tiffany L. Walters, Assistant United States Attorney (Alexander M.M.
Uballez, United States Attorney, with her on the brief), Albuquerque, New
Mexico, for Plaintiff – Appellee.

———————————————

Before **CARSON**, **EBEL**, and **ROSSMAN**, Circuit Judges.

———————————————

**ROSSMAN**, Circuit Judge.

———————————————

    After the government charged Mr. Steven O'Neil with violating the

federal felon-in-possession statute, 18 U.S.C. § 922(g)(1), he moved to

suppress eyewitness identification evidence and a gun seized from his backpack. The district court denied the motions. Mr. O'Neil now appeals, making two arguments. First, he contends the identifications should have been excluded because they were unreliable. Second, he contends the district court erred in concluding the gun would have been inevitably discovered during an inventory search. We disagree with Mr. O'Neil on both issues. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.[1]

## I.    Background[2]

### A.    Factual History

On December 1, 2018, a little after 9 p.m., college student Matthew Salmon and his friend Cagsu Caglar planned to have dinner at a dining hall on the University of New Mexico ("UNM") campus. Mr. Salmon drove them to campus in his two-door coupe and parked at a UNM parking lot. Mr. Salmon then got out of the car to pay for parking; Ms. Caglar stayed in the passenger seat. Although it was dark, the parking lot was illuminated.

---

[1] After examining the briefs and appellate record, this panel unanimously determined to grant the parties' request for a decision on the briefs. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case was therefore ordered submitted without oral argument.

[2] We derive the background facts from the district court's comprehensive factual recitation in its memorandum and order on the motions to suppress. ROA, vol. I at 153-92.

While Ms. Caglar waited in the car, she saw a man a few parking spaces away looking into vehicles and carrying what she thought was a black handgun. After a minute and a half, the person approached and put his face about two inches from the passenger window. Ms. Caglar looked at the man's face for ten to fifteen seconds.

When Mr. Salmon returned, the man was still standing at the passenger-side door. The two locked eyes across the roof of the car for thirty seconds to one minute. During this period of "hard eye contact," the man pointed a gun at Mr. Salmon and removed the magazine, demonstrating the clip was loaded. ROA, vol. I at 154. Mr. Salmon later testified he was familiar with guns and thought the weapon "looked like a 9-millimeter." ROA, vol. III at 15. Mr. Salmon then got back into the car and exited the parking lot.

As Mr. Salmon and Ms. Caglar drove away from campus, Ms. Caglar called 911 and was transferred to the UNM Police Department. During the call, Mr. Salmon turned the car around and headed toward the university police station—about a one-minute drive from the parking lot where the confrontation had just occurred. At the station, Mr. Salmon and Ms. Caglar described the person they had just encountered as a man with a slender build and facial hair wearing a black hoodie and carrying a black handgun.

Several officers from the UNM Police Department, including Officer Nathan Lerner and Officer Tim Delgado, then drove to the scene of the

3

encounter. Once at the UNM parking lot, Officer Lerner saw a man who matched the descriptions provided by Mr. Salmon and Ms. Caglar. The man sat on a bench, wearing a hoodie, and holding a black object, which Officer Lerner thought "was the black Glock." ROA, vol. III at 46, 63; ROA, vol. I at 155. There was a backpack on the bench.[3]

Officer Lerner told the suspect to put his hands up, but he did not comply. Instead, he stood and walked toward Officer Lerner. On the third command, the man put his hands up and then got on the ground. Officer Lerner, helped by Officer Delgado, placed him in handcuffs. The object Officer Lerner suspected was a gun was actually a shoe. Officer Delgado then went looking for the handgun Ms. Caglar and Mr. Salmon had reported seeing.

Around this time, Officer Camacho drove Mr. Salmon and Ms. Caglar back to the UNM parking lot for an in-field identification. When they arrived at the scene, the man (later identified as Mr. O'Neil) was handcuffed and standing near several officers. Police cruisers with their lights on were parked nearby. Mr. Salmon and Ms. Caglar drove within fifteen to twenty feet of the suspect, who was visible in the squad car's headlights. From inside

---

[3] Officer Delgado testified the backpack "was there on the bench," ROA, vol. III at 85, while Ms. Caglar testified the backpack "wasn't sitting on a bench. It was on the ground." *Id.* at 109. The district court found the backpack was "on the bench," ROA, vol. I at 155, and neither party disputes this fact on appeal. We accept the district court's finding.

the squad car, Mr. Salmon and Ms. Caglar identified Mr. O'Neil as the man they had encountered in the parking lot earlier that evening. Approximately 15 to 20 minutes had elapsed since the initial encounter. ROA, vol. III at 20; ROA, vol. I at 154-55.

Meanwhile, as Officer Delgado was searching for the unaccounted-for gun, he heard over his police radio that the witnesses had made a positive in-field identification. A few minutes later, Officer Delgado located a backpack on a bench about twenty feet from where Mr. O'Neil was standing while he was detained. Officer Delgado searched the backpack and found a black handgun inside.[4]

## B.    Procedural History

In a single-count indictment, the government charged Mr. O'Neil with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).[5] Mr. O'Neil filed two suppression motions. First, he sought to

---

[4] Mr. O'Neil contends his backpack was searched *before* Officer Delgado learned of the positive witness identifications. Aplt. Br. at 16-17. As we will explain, this argument is waived, and even if we reached it, we would not conclude the district court's contrary finding was clearly erroneous.

[5] Mr. O'Neil was first prosecuted in state court for violating New Mexico's felon-in-possession statute, N.M. Stat. Ann. § 30-7-16. Mr. O'Neil filed similar motions to suppress in state court. After an evidentiary hearing, the state court granted Mr. O'Neil's motion to suppress the gun, and the state case was dismissed without prejudice.

suppress the in-field identifications by Mr. Salmon and Ms. Caglar, which he claimed were infected by improper police influence and unreliable, in violation of the Due Process Clause. Second, he sought to suppress the gun seized from his backpack in violation of the Fourth Amendment.

In January 2021, after full briefing, the district court conducted an evidentiary hearing on the motions to suppress.[6] Mr. Salmon and Ms. Caglar testified for the prosecution, as did Officers Lerner and Delgado. The defense did not put on any evidence. On direct examination, Mr. Salmon described Mr. O'Neil's appearance at the time of their initial encounter in the parking lot. "I could tell that he was white, a little bit taller than me," Mr. Salmon stated. "He had a beard at the time, and a hoody [with] the hood on." ROA, vol. III at 16. When questioned about the in-field identification, Mr. Salmon testified, "[t]here was no doubt in my mind that he was the same man" as the person encountered in the UNM parking lot earlier that night. *Id.* at 21. "I just noticed that he had the same stature," Mr. Salmon said. "He had the same sweatshirt on. The same facial hair. The same skin tone. It was pretty obvious that it was the same guy." *Id.*

According to Ms. Caglar, she could identify Mr. O'Neil at the scene because, during the confrontation in the parking lot, she had focused on his

---

[6] Mr. O'Neil waived an in-person hearing, so the proceedings took place with all participants appearing by video conference.

race, "Caucasian," and "his hair color; his beard color; his clothes; his hoody, which was black." *Id.* at 103. Ms. Caglar testified that, during the encounter, Mr. O'Neil "was actually wearing a backpack . . . I couldn't see the back side of his backpack, but I could see the arm strings around his arm." *Id.* at 98. In response to being asked if she was "absolutely clear" about the identification, Ms. Caglar answered, "Yes." *Id.* at 102.

Officer Lerner then testified about detaining Mr. O'Neil and the in-field identification that followed. Officer Delgado's testimony focused on his hunt for the gun after Mr. O'Neil was detained and the eventual search of Mr. O'Neil's backpack and seizure of the handgun inside. Both officers testified about the UNM Police Department's inventory procedures.

In a written order, the district court denied Mr. O'Neil's motions to suppress. The district court first agreed with Mr. O'Neil that the in-field identification procedure was unnecessarily suggestive. Law enforcement had conducted a "show-up," the district court explained, which "by definition occurs when 'the police present only one suspect to the identifying witness[es].'" ROA, vol. I at 159 (citation omitted). Here, Mr. O'Neil was singly presented, in handcuffs, surrounded by police officers, and at the scene of the crime. The district court emphasized courts have endorsed less-suggestive identification procedures, but here, the witnesses made their identifications in each other's presence while sitting together in the police

cruiser and after law enforcement asked, "We need you to ID him . . . is that the man?" *Id.* at 160.

Although it found the show-up unnecessarily suggestive, the district court concluded the identifications were "highly reliable." *Id.* at 160-61. The district court considered the factors in *Neil* v. *Biggers*, 409 U.S. 188 (1972), to assess the reliability of the identifications. Based on the totality of the circumstances, the district court determined there was "very little likelihood of misidentification" by Mr. Salmon and Ms. Caglar, and thus no due process violation that would require suppression of the identification evidence. *Id.* at 160.

The district court next considered Mr. O'Neil's claim that the warrantless search of his backpack, and the seizure of the gun found inside, violated the Fourth Amendment. The government maintained the exigent circumstances exception to the warrant requirement applied because the gun—which the witnesses had reported seeing but was still unaccounted for—posed a risk to officers and the public. The district court rejected the government's exigency argument but refused to suppress the gun, concluding it would have been inevitably discovered pursuant to the UNM Police Department's standardized inventory procedures.

On August 26, 2021, Mr. O'Neil entered a conditional guilty plea to the single-count indictment, reserving his right to appeal the district court's

order denying his motions to suppress. Mr. O'Neil was sentenced to 27 months in prison, followed by 3 years of supervised release. This timely appeal followed.

## II.    Discussion

Mr. O'Neil argues the district court erred in denying his motions to suppress the eyewitness identifications and the gun.[7] We review a district court's denial of a motion to suppress by "view[ing] the evidence in the light most favorable to the determination of the district court." *United States* v. *Johnson*, 43 F.4th 1100, 1107 (10th Cir. 2022) (citation omitted). The ultimate question of whether an individual's constitutional rights have been violated is reviewed de novo. *See id.* (Fourth Amendment); *United States* v. *Thody*, 978 F.2d 625, 628 (10th Cir. 1992) (Due Process Clause). "The 'clearly erroneous' standard applies with respect to the trial court's factual findings 'even when those findings relate to a constitutional issue.'" *Thody*, 978 F.2d at 629 (citations omitted). As we explain, we affirm the district court's well-reasoned suppression rulings.

---

[7] Mr. O'Neil also sought to exclude "the expected in-court identification by both Cagsu Caglar and Matthew Salmon." ROA, vol. I at 33. The district court correctly found this argument premature because "[a]n in-court identification is technically one that is 'made for the first time in court[ ]' before a jury, which has not yet occurred in this case." *Id.* at 162 (citation omitted). Mr. O'Neil was convicted after pleading guilty pursuant to a plea agreement, so he makes no appellate argument about in-court identifications.

A.    **The district court did not err in denying the motion to suppress the eyewitness identifications because they were reliable.**

Typically, "juries are assigned the task of determining the reliability of the evidence presented at trial." *Perry* v. *New Hampshire*, 565 U.S. 228, 237 (2012). When evidence "'is so extremely unfair that its admission violates fundamental conceptions of justice,'" the Supreme Court has "imposed a constraint tied to the Due Process Clause." *Id.* (quoting *Dowling* v. *United States*, 493 U.S. 342, 352 (1990)). The admission of eyewitness identification evidence raises due process concerns "only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Id.* at 238-39 (citations omitted).[8]

Unnecessary suggestiveness alone does not require exclusion of identification evidence. "It is the likelihood of misidentification which violates a defendant's right to due process," so "the central question [is] whether under the 'totality of the circumstances' the identification was reliable."

---

[8] As the Supreme Court has acknowledged, "The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." *United States* v. *Wade*, 388 U.S. 218, 228 (1967). But absent unnecessarily suggestive procedures, the reliability of eyewitness identifications is ensured through traditional trial protections. *Perry*, 565 U.S. at 233; *see also United States* v. *Thomas*, 849 F.3d 906 (10th Cir. 2017) ("[E]videntiary reliability is traditionally a question for the jury . . . and . . . other due-process protections are in place that limit the weight the jury attributes to evidence that may be unreliable.").

*Biggers*, 409 U.S. at 198-99. This makes "reliability [] the linchpin in determining the admissibility of identification testimony." *Manson* v. *Brathwaite*, 432 U.S. 98, 114 (1977).

Courts assess reliability—or put differently, "evaluat[e] the likelihood of misidentification"—by examining the totality of the circumstances, including (1) the opportunity of the witness to view the defendant at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of any prior description given by the witness, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Biggers*, 409 U.S. at 199-200; *see also Archuleta* v. *Kerby*, 864 F.2d 709, 710-12 (10th Cir. 1989) (applying *Biggers* factors to conclude a suggestive show-up identification—where the suspect was presented alone and handcuffed at the scene of the crime approximately thirty minutes after the witnesses' initial encounter—was nevertheless reliable); *United States* v. *Bredy*, 209 F.3d 1193, 1195-97 (10th Cir. 2000) (same). "[I]f the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." *Perry*, 565 U.S. at 232.

Here, the district court concluded law enforcement used an unnecessarily suggestive identification procedure. The government has not

contended otherwise.[9] We thus consider only Mr. O'Neil's argument that the district court erred in concluding the witnesses "made highly reliable identifications." ROA, vol. I at 161. The district court recited all the *Biggers* factors in assessing reliability, but on appeal, Mr. O'Neil focuses primarily on challenging the first three: (1) the opportunity of the witness to view the defendant at the time of the crime, (2) the witness's degree of attention, and (3) the accuracy of any prior description given by the witness. His arguments are unavailing.

*First*, Mr. O'Neil maintains that "neither witness had a very good opportunity to view the suspect" because the "encounter lasted only a matter of minutes at night." Aplt. Br. at 23. The record shows otherwise. As the district court correctly determined, the witnesses' opportunity to view Mr.

---

[9] Although we need not address this first step, we briefly observe the record amply supports the district court's conclusion. Suggestive procedures are those which convey "intentionally or unintentionally, that [police officers] expect the witness to identify the accused," *Moore* v. *Illinois*, 434 U.S. 220, 224 (1977), or are "so arranged as to make the resulting identifications virtually inevitable," *Foster* v. *California*, 394 U.S. 440, 443 (1969). Here, the district court concluded the procedure was unnecessarily suggestive because Mr. O'Neil was "the only suspect shown [and] was handcuffed, surrounded by police officers [] at the scene of the crime," and "the witnesses made their identifications in each other's presence." ROA, vol. I at 160. These circumstances, the district court determined, "gave the impression that the police had their man." *Id.* (citation omitted).

O'Neil during the confrontation—before the in-field identification—indicates the identification was reliable.

The witnesses saw Mr. O'Neil up close during their encounter with him in the UNM parking lot. Ms. Caglar observed Mr. O'Neil in the parking lot for a minute and a half as he approached the car and then "put his face two inches from the car's passenger window" where she was seated. ROA, vol. I at 161. When Mr. Salmon returned to the car after paying for parking, he had an independent opportunity to look at Mr. O'Neil. The two men stared at each other over the roof of Mr. Salmon's car "for about thirty seconds to one minute." *Id.* Mr. Salmon was close enough to Mr. O'Neil to identify the firearm he carried. And though the encounter occurred on a December evening (at approximately 9:20 p.m.), the parking lot was illuminated. Under the circumstances, Mr. O'Neil has not demonstrated error, let alone clear error. *See Johnson*, 43 F.4th at 1107 ("A district court's factual finding is clearly erroneous when it is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made."); *see also United States* v. *Patterson*, 20 F.3d 809, 815 (10th Cir. 1994) ("The judge decided [the witness] had a good opportunity

13

to view Mr. Patterson before and after the hijacking. No evidence has been presented to show the district court's determination is clearly erroneous.").[10]

*Second*, Mr. O'Neil contends the witnesses paid insufficient attention to his appearance during the encounter and thus could only offer vague and unreliable descriptions. We disagree. Both witnesses paid close attention to Mr. O'Neil's appearance when they saw him in the UNM parking lot. Mr. Salmon and Mr. O'Neil "stared into each other's faces" for almost a minute. ROA, vol. I at 161. Likewise, while waiting in the passenger seat, Ms. Caglar observed Mr. O'Neil in the parking lot and then got a closer look at him when he put his face to the passenger window. As the district court put it, "there is a good reason to believe" Ms. Caglar knew what Mr. O'Neil looked like. *Id.* The record thus does not support Mr. O'Neil's argument that the identifications are unreliable because the witnesses solely "focused on looking into [his] eyes or the gun" during the encounter. Aplt. Br. at 23.

---

[10] To the extent Mr. O'Neil contends an encounter of short duration in dark conditions is inherently unreliable, we disagree. Mr. O'Neil has provided no authority for such a blanket proposition, which would be inconsistent with the general rule that the reliability of an eyewitness identification must be considered on a "case-by-case basis," *Perry*, 565 U.S. at 239, and under the "totality of the circumstances," *see, e.g.*, *Biggers*, 409 U.S. at 199; *United States* v. *Williams*, 605 F.2d 495, 498 (10th Cir. 1979).

*Finally*, Mr. O'Neil contends the witnesses did not accurately describe him before positively identifying him in the field. He emphasizes that, after the encounter in the parking lot, Mr. Salmon and Ms. Caglar did not provide enough details to law enforcement about his height or the color and cut of his clothing. Neither witness mentioned he had a backpack or a dog, which Mr. O'Neil claims are "highly distinctive" characteristics "that would stick out in a recollection, particularly a recent recollection." *Id.* at 24. Mr. O'Neil also points out he weighed 237 pounds on the date of the incident, so it was inaccurate to describe his build as "slender." *Id.* at 23-24.[11]  We are not persuaded.

The district court correctly acknowledged the existence of some differences between the witnesses' descriptions of Mr. O'Neil and his actual appearance. "For example," the district court said, "Salmon described Defendant as slender when he was large; Caglar believed he had ginger colored hair when his was darker; and apparently Defendant had a small dog

---

[11] The government disputes the 237-pound figure, stating "[t]he record does not contain any evidence verifying that O'Neil weighed 237 pounds." Appl. Br. at 19 n.9. The government points to Mr. O'Neil's driver's license which states he is 6'1" tall and weighs 220 pounds. The district court credited the 237-pound figure in its factual findings, and we see no clear error.

15

with him that the witnesses did not report seeing." ROA, vol. I at 162.[12] As the government correctly contends, a witness's "description [can be] accurate even where it contained minor errors." Appl. Br. at 21 (citing *Archuleta*, 864 F.2d at 712). But errors, even slight ones, must be considered case-by-case when evaluating the reliability of the eyewitness identification under the totality of the circumstances. Here, the record supports the district court's conclusion that the discrepancies in this case "do not detract from the fact that the witnesses' descriptions, given over numerous occasions, are largely consistent with one another and with [Mr. O'Neil's] actual appearance." ROA, vol. I at 162.

Moreover, the final two *Biggers* factors—the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation—are unchallenged by Mr. O'Neil and do not undermine the district court's reliability determination. The district court correctly observed that the witnesses "expressed complete certainty in their identifications." *Id.*[13] Mr. Salmon testified there was "no

---

[12] Although the backpack was not mentioned in the description provided to police, Ms. Caglar testified at the suppression hearing she saw that Mr. O'Neil "was actually wearing a backpack." ROA, vol. III at 98. The record does not resolve whether Mr. O'Neil had a dog with him that night.

[13] We have no reason to question the district court's reliance in this case on the witnesses' own level of certainty in their identifications. But

doubt" Mr. O'Neil was the man they had encountered. Ms. Caglar likewise maintained she was "absolutely clear" during the in-field identification that Mr. O'Neil was the individual in the parking lot. And the record shows the positive in-field identifications occurred only about twenty minutes after the incident.

We thus affirm the district court's conclusion that the identifications were "highly reliable," and need not be suppressed, even though the identification procedure used by law enforcement was unnecessarily suggestive.

**B.    The district court did not err in denying the motion to suppress the gun found in Mr. O'Neil's backpack because it would have been inevitably discovered.**

Mr. O'Neil's second motion to suppress concerned the gun, which he claimed was seized pursuant to an illegal search of his backpack. The government originally invoked the exigent circumstances exception to justify the warrantless search, contending "an unattended gun in a heavily trafficked area" made for "a clear instance of exigency." *Id.* at 40. The district court rejected this argument, finding no exigency because the scene was

---

there will not always be clear correlation between witness confidence and accuracy. *See, e.g.*, 2 Wayne R. LaFave et al., *Criminal Procedure* § 7.4(c) (4th ed. 2015) ("The level of certainty demonstrated at the confrontation by the witness . . . is not a valid indicator of the accuracy of the recollection.") (collecting cases).

secure, a pat-down search revealed no weapons, and Mr. O'Neil was handcuffed and separated from his backpack by about twenty feet when he was detained. "[W]hile the record contains some facts supporting a conclusion that the risk to the public's safety or third persons was present," the district court reasoned, "those facts are not so overwhelming to dispense with the warrant requirement before conducting a search or seizure." *Id.* at 166.

The government offered no other basis for finding the warrantless search satisfied the Fourth Amendment. Notwithstanding the constitutional violation, however, the government maintained the gun should not be suppressed because it would have been inevitably discovered during an inventory search by the UNM police. The district court agreed with the government. As soon as the witnesses positively identified Mr. O'Neil in the field, the district court explained, law enforcement had probable cause to arrest him. The district court concluded that, once Mr. O'Neil was arrested, his backpack was "necessarily going to be searched and inventoried under the university police department's inventory policy." *Id.* at 168.

On appeal, Mr. O'Neil challenges the district court's decision to deny suppression of the gun on inevitable discovery grounds. We begin by reciting the legal foundation for the inevitable discovery exception before explaining why the district court correctly applied it here to deny Mr. O'Neil's motion to suppress.

### 1.    Inevitable Discovery

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Searches conducted without a warrant are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Roska ex rel. Roska* v. *Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003) (citation omitted). Evidence obtained through an unconstitutional search will be inadmissible under the exclusionary rule unless the government proves an exception applies. *United States* v. *Neugin*, 958 F.3d 924, 931-32 (10th Cir. 2020).

The Supreme Court has recognized "the ultimate or inevitable discovery exception to the exclusionary rule," which applies when "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . ." *Nix* v. *Williams*, 467 U.S. 431, 444 (1984). "Those lawful means include an inventory search." *United States* v. *Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003) (*citing United States* v. *Ibarra*, 955 F.2d 1405, 1410 (10th Cir. 1992) ("[I]f evidence seized unlawfully would have been inevitably discovered in a subsequent inventory search, such evidence would be admissible.")); *see also Colorado* v. *Bertine*, 479 U.S. 367, 371 (1987)

("[I]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment.").

The inevitable discovery exception is not a windfall device. It is not intended to put police in a better position but only "in the same, not a worse, position [than] they would have been in if no police error or misconduct had occurred." *Nix*, 467 U.S. at 443. In assessing the government's burden, we are mindful "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification." *Id.* at 444 n.5.

### 2.    Analysis

Mr. O'Neil challenges the application of the inevitable discovery exception to the exclusionary rule on two grounds; neither is availing.[14]

*First*, Mr. O'Neil contends there was no probable cause to arrest him before the gun was discovered. The government faults Mr. O'Neil for failing

---

[14] Mr. O'Neil also seems to contend his arrest was not justified, even if the eyewitness identifications are admissible, because illegally carrying a firearm on university premises is only a misdemeanor under New Mexico law. This argument is advanced only in the Summary of Argument section of Mr. O'Neil's opening brief and not otherwise developed; it is therefore waived. *See Bronson* v. *Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief."); *Ewing* v. *Doubletree DTWC, LLC*, 673 F. App'x 808 (10th Cir. 2016) (unpublished) ("[Plaintiff] dedicates less than one page to this issue in the Summary of Argument section of her brief and then never discusses this issue in the actual Argument section. Such a flimsy and deficient legal analysis is inadequate to preserve an issue for appeal.").

to address the district court's finding that probable cause to arrest would have existed even without the subsequent seizure of the gun, just based on the witness identifications. We agree with the government.

"[A] government official must have probable cause to arrest an individual." *Cortez* v. *McCauley*, 478 F.3d 1108, 1117 (10th Cir. 2007). "Probable cause is measured at the moment the arrest occurs and must derive from facts and circumstances based on reasonably trustworthy information." *Id.* at 1121. Courts generally deem a victim's identification of their assailant reasonably trustworthy to support probable cause to arrest. *See id.* ("[O]rdinarily, the statement of a victim of a crime to police may establish probable cause absent some reason to think the statement not trustworthy."); *see also Stansbury* v. *Wertman*, 721 F.3d 84, 90 (2d Cir. 2013) ("[A]bsent circumstances that raise doubts as to the victim's veracity, a victim's identification is typically sufficient to provide probable cause.") (citation omitted); *Ahlers* v. *Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) ("A law enforcement officer is entitled to rely on an eyewitness identification to establish adequate probable cause with which to sustain an arrest.").

Mr. O'Neil focuses on the unconstitutionality of the backpack search, but he offers no argument to explain why the district court erred in its probable cause assessment when analyzing the applicability of the inevitable

discovery exception.[15] Under the circumstances, and particularly given no contrary argument, the district court did not err in concluding the witness identifications would have given law enforcement probable cause to arrest Mr. O'Neil.

*Second*, Mr. O'Neil claims the government failed to carry its burden of establishing that the inventory search was conducted according to standardized procedures. The government offered no written policy of UNM's inventory protocols, Mr. O'Neil contends, but provided only a "general reference to some undescribed inventory search process Officer Delgado would have undertaken." Aplt. Br. at 22. The government concedes no

---

[15] Mr. O'Neil suggests in his Summary of Argument that the district court clearly erred in finding the backpack was searched *after* the in-field identifications, but he does not develop this argument in his opening brief and has therefore waived it. Aplt. Br. at 16-17; *see Bronson*, 500 F.3d at 1104. Even if we reached the merits, we would reject the argument. The district court acknowledged that, in the federal case, Officer Lerner testified the backpack search was done after the in-field identification, but in state court, he testified to the opposite chronology of events. According to the district court, however, "[t]hese differing accounts do not render Lerner's testimony unreliable, but instead highlight gaps in Lerner's recollection of events. Those gaps were filled by Officer Delgado, however, who testified that he personally searched the backpack and consistently maintained that he did so after the witnesses identified [Mr. O'Neil]." ROA, vol. I at 156 n.1. We discern no clear error in the district court's decision to credit Officer Delgado's rendition of events and on that basis, to find the backpack was searched after the witnesses positively identified Mr. O'Neil. *See United States* v. *Souza*, 223 F.3d 1197, 1201 (10th Cir. 2000) ("[T]he district court's factual determinations are reviewed only for clear error."); *see also United States* v. *Long*, 176 F.3d 1304, 1307 (10th Cir. 1999) ("The credibility of witnesses . . . fall[s] within the province of the district court.").

written inventory procedures were introduced into evidence. According to the government, "standard inventory procedures and practices can be proven by testimonial evidence." Appl. Br. at 31. The government points to the testimony of Officers Lerner and Delgado at the suppression hearing as sufficient to satisfy its burden of establishing standardized inventory procedures. We discern no error.

"A so-called inventory search is not an independent legal concept but rather an incidental administrative step following arrest and preceding incarceration." *Illinois* v. *Lafayette*, 462 U.S. 640, 644 (1983). Inventory searches are "not treated as investigative searches because they serve three administrative purposes: 'the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger.'" *Tueller*, 349 F.3d at 1243 (quoting *South Dakota* v. *Opperman*, 428 U.S. 364, 369 (1976)).

An inventory search is unconstitutional unless conducted "according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Florida* v. *Wells*, 495 U.S. 1, 4 (1990) (quoting *Bertine*, 479 U.S. at 375); *United States* v. *Haro-Salcedo*, 107 F.3d 769, 772 (10th Cir.1997) (inventory searches "are reasonable only if conducted according to standardized procedures"). "[R]easonable police . . . inventory

23

procedures administered in good faith satisfy the Fourth Amendment."
*United States* v. *Taylor*, 592 F.3d 1104, 1108 (10th Cir. 2010) (quoting
*Bertine*, 479 U.S. at 374). The government carries the burden of
demonstrating reasonableness. *Id.* at 1107.

Our precedent does not require the government to produce standard
inventory procedures in writing. *See United States* v. *Kornegay*, 885 F.2d 713,
717 (10th Cir. 1989) ("The record reflects no written regulation . . . but the
testimony of Agent Blanton established that it is the customary and standard
practice [to perform an inventory] when a vehicle is impounded."). What is
required is that the government prove "[t]he policy or practice governing
inventory searches [is] designed to produce an inventory" and is not a "ruse
for a general rummaging in order to discover incriminating evidence." *Wells*,
495 U.S. at 4.

Officer Lerner testified at the suppression hearing that "[e]verybody we
arrest, we take their stuff and we don't tag it into evidence. We tag it in for
safekeeping." ROA, vol. III at 56. Likewise, Officer Delgado testified "by our
policy, we needed to go through the backpack to make sure [because] we're
responsible for any belongings belonging to a person that's placed in custody."
*Id.* at 79. On cross-examination, Officer Delgado was asked why he searched
the backpack, and he said, "our policy is any time we place anybody in
custody their possessions [are] our responsibility. . . . [W]e have to make sure

24

there's no narcotics, weapon, alcohol, food, or anything in there before we can place them in safekeeping. So we have to search them." *Id*. at 86.

Here, Officer Lerner's and Officer Delgado's testimony suffices to show UNM police had a policy to take and inventory for safekeeping the possessions of anyone they arrest.[16] We thus affirm the district court's conclusion that suppression was not warranted because the gun would have been inevitably discovered under the standard inventory procedures used by UNM police.

## III.    Conclusion

We affirm the district court's denial of Mr. O'Neil's motions to suppress the eyewitness identifications and the gun.

---

[16] We note that, when the government seeks to demonstrate the existence of standardized procedures to establish the reasonableness of an inventory search under the Fourth Amendment, the better practice would be to introduce the written inventory procedures, if they are available.