**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 16, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

SERGIO RUIZ,

    Defendant - Appellant.

No. 23-2027

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 2:21-CR-01389-KG-1)**

_____

Amanda Skinner, Assistant Federal Public Defender (Imtiaz Hossain, Assistant Federal Public Defender; and Margaret A. Katze, Federal Public Defender, with her on the brief), Office of the Federal Public Defender, Las Cruces, New Mexico, for Defendant-Appellant.

Joni Autrey Stahl, Assistant United States Attorney (Alexander M.M. Uballez, United States Attorney, with her on the brief), Office of the United States Attorney, Las Cruces, New Mexico, for Plaintiff-Appellee.

_____

Before **TYMKOVICH**, **BALDOCK**, and **ROSSMAN**, Circuit Judges.

_____

**BALDOCK**, Circuit Judge.

_____

United States Customs and Border Patrol (CPB) Officers seized Defendant Sergio Ruiz at the Columbus, New Mexico port of entry with 20.8 kilograms of methamphetamine and an active GPS tracker concealed inside his pickup truck's spare tire. To prove

Defendant's knowledge of the drugs, the Government put on a confidential informant's testimony identifying Defendant as "Señor de Llanta," or in English, "Tire Man," a courier with a twenty-year history of concealing and transporting narcotics in spare tires. Defendant argues the identification should have been suppressed because it was based on a purportedly suggestive pretrial photo array. Setting aside the photo array procedure, we conclude there was no substantial likelihood of misidentification under the totality of the circumstances, where the informant met with Defendant for three separate drug transactions—including a ten-minute face-to-face conversation—and provided consistent, detailed, and accurate descriptions of Defendant *before* identifying him in the photo array. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.

### A.

Defendant Sergio Ruiz lived in the border town of Columbus, New Mexico, and crossed into Mexico nearly every day. On the afternoon of April 28, 2021, Defendant entered the Columbus port of entry from Mexico alone in his Chevrolet Silverado pickup. CBP officers recognized him as a regular crosser. But this time was different— Defendant's truck bed was loaded with cinderblocks, rebar, and two 55-gallon drum barrels. Defendant told officers he had purchased the materials to build a wall at his home. The primary investigating officer, Adrian Alvarado, suspected Defendant's cargo might be a "commercial load" that he would have declare to customs. Officer Alvarado phoned his supervisor to confirm. During their phone call, Officer Alvarado's supervisor advised him

there was a "Be on the Lookout" (BOLO) for someone matching Defendant's name and physical description for possible narcotics trafficking.

Officer Alvarado referred Defendant to the secondary inspection area for further investigation. There, officers instructed Defendant to drive through a "Z Portal" vehicle X-Ray machine. The scan revealed an anomaly in Defendant's spare tire. Officers removed the tire, cut it open, and discovered packages containing 20.8 kilograms of methamphetamine along with an active GPS tracking device. Officers also discovered the tool used to remove the spare tire was loose in the truck bed rather than its original location. Defendant consented to a custodial interview at the port of entry. He denied any knowledge of the narcotics. Defendant told officers he had purchased the truck three years ago and "maintained control of the vehicle at all times." He also told officers, however, that he left the truck unattended overnight at a hardware store in Mexico to have the cinderblocks loaded in the bed. He picked the truck up the following day and drove it to the port of entry where he was seized. Defendant consented to a search of his phone, which contained no call or text history.[1]

**B.**

A federal grand jury indicted Defendant on three counts: (1) conspiracy to possess with intent to distribute 500 grams or more of methamphetamine; (2) possession with intent to distribute 500 grams or more of methamphetamine; and (3) importation of 500 grams or

---

[1] Homeland Security and Investigations (HSI) Special Agent Joshua Laughter testified that, in his experience, narcotics couriers often delete their call and text message history prior to crossing the border.

more of methamphetamine and aiding and abetting.  Defendant exercised his right to a jury

trial.  The Government anticipated Defendant would put on a defense at trial that he served

as an unknowing courier or "blind mule" for the cartel.  As such, the Government proposed

to offer confidential informant Eric Weaver's testimony identifying Defendant as "Senor

de Llanta," or "Tire Man"—the person Weaver knew to be a courier who transported

narcotics in spare tires.[2]

Weaver purchased a spare tire containing methamphetamine from the person he

knew as Tire Man three times in August and September of 2020.  On the first occasion,

Weaver arranged to buy a pound of methamphetamine from a contact in Mexico.  That

person directed Weaver to meet up with a woman at a park in El Paso, Texas.  Weaver met

with the woman and paid her, but she did not immediately hand over the

methamphetamine.  Instead, she walked over to a dark colored '90s pickup truck and

removed a spare tire from the bed.  Weaver observed who he described as an older Mexican

man in his fifties, dressed like a cowboy—the person he came to know as Tire Man—help

the woman put the spare tire in her van.  Weaver had a clear view of Tire Man through his

car window in broad daylight for approximately thirty seconds.  Shortly thereafter, the

---

[2] Eric Weaver agreed to cooperate with police following his arrest for possession with intent to distribute eleven pounds of methamphetamine in September 2020. Weaver continued to sell narcotics until police arrested him again in December 2020 with multi-kilogram quantities of methamphetamine.  Defendant argues these facts, along with Weaver's other prior convictions, render his identification unreliable.  But this is an argument about Weaver's credibility as a witness generally, not the reliability of his identification.  The jury took into consideration Weaver's prior convictions and his status as an informant in evaluating the credibility of his testimony in its totality, including his statements regarding the photo array.

woman provided the spare tire to Weaver at a second location. Inside the tire were nine packages of methamphetamine wrapped in duct tape.

One week later, Weaver met Tire Man directly for a second transaction. This time, Weaver's contact in Mexico instructed him to drive to an apartment adjacent to the same park in El Paso. When he arrived, Tire Man knocked on his car window and led Weaver to the apartment. Weaver spent approximately ten minutes in close proximity to Tire Man, including a period where the two conversed while standing "next to each other" in the kitchen. Weaver observed that he was dressed in a short sleeve starched "livestock" shirt, blue jeans, cowboy boots, and a bolo tie. Weaver also noticed the man had splotches on his arms and hands resembling a chemical burn. Tire Man provided Weaver with a second spare tire containing 14 or 15 packages of methamphetamine wrapped in duct tape and brown packing tape.

A few days before Weaver's arrest in September 2020, he met with Tire Man for a third and final time. Weaver drove to the same apartment and arrived to find Tire Man standing outside next to his truck. Weaver placed his money in the bed of the man's truck, and, in exchange, Tire Man helped load a spare tire from his truck bed into Weaver's vehicle. The transaction took place during daylight hours and lasted less than one minute. Weaver stood within five feet of Tire Man. Weaver recalled acting nervous because he thought he was being followed. Tire Man warned him not to act paranoid and explained that he avoided arrest over a twenty-year period as a courier because "he knew how to act." The third tire contained bundles of methamphetamine and fentanyl pills. Over the course of their three interactions, Weaver learned that Tire Man obtained his methamphetamine

5

from sources in Juárez, typically smuggled the narcotics across the Columbus port of entry, and earned approximately one thousand dollars per kilo of narcotics he transported.

Weaver relayed this information to law enforcement in a series of interviews soon after his arrest. Weaver's first interview was just one or two days after his third encounter with Tire Man. Weaver described the man to police as an older Hispanic male with grey hair, dressed in "cowboy style," with skin discoloration on both arms resembling chemical burns. Weaver also described Tire Man's vehicle as a dark-colored '80s or '90s square-bodied pickup—like the one Defendant was driving at the time of his arrest. Weaver consistently recounted the same description to police in at least four more interviews.

During his final interview with law enforcement in March 2022, Weaver identified Defendant as Tire Man from a photo array. At the outset of the meeting, Weaver repeated the same consistent physical description of the courier who provided him methamphetamine. Then, HSI Special Agent Juan Carlos Vargas presented him with a six-person photo array. All six photos depicted similarly aged Hispanic men. Agent Vargas told Weaver that Defendant's photo may or may not be in the array. Weaver "focused immediately" on Defendant's photo and asked for a lighter version. Agent Vargas then showed Weaver a second distinct photo of Defendant. The second photo appears to be taken at the same time and place as the first photo, but from a slightly different angle, with brighter lighting, and with the subject's COVID-19 surgical mask removed from his neck. Upon viewing the second photo, Weaver positively identified Defendant as Tire Man. He expressed no doubt or uncertainty about his identification.

## C.

Before trial, Defendant filed a motion to suppress Weaver's pretrial photo array identification and his anticipated in-court identification of Defendant. Defendant argued the photo array was suggestive because his photo had three unique characteristics that set it apart from the other five: it was darker, had horizontal lines in the background indicative of a mug shot, and only Defendant wore a mask around his neck, suggesting his arrest was during the COVID-19 pandemic and therefore more recent. These differences were magnified, Defendant argued, by the fact that the array contained just six photos. Defendant maintained the district court should prohibit Weaver from identifying Defendant at trial because the tainted photo array created a substantial likelihood of misidentification. The district court disagreed. The court remarked the photo array "leans toward not being impermissibly suggestive," but regardless, held Defendant's motion failed because Weaver's identification was reliable under the totality of the circumstances. The court reasoned that Weaver had three opportunities to view Defendant at close range, had consistently and accurately described Defendant's physical appearance and vehicle, and expressed no doubt or uncertainty as to his conclusion.

Weaver identified Defendant at trial. The jury convicted Defendant on all counts. Defendant now appeals the denial of his motion to suppress.

## II.

"When reviewing the district court's denial of a motion to suppress, we view the evidence in the light most favorable to the government and accept the district court's factual findings unless they are clearly erroneous." *United States v. Tolbert*, 92 F.4th 1265,

7

1273 (10th Cir. 2024) (citation omitted). We may consider evidence introduced at the suppression hearing and any evidence properly admitted at trial. *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008). We review the ultimate legal question of whether a defendant's constitutional rights were violated de novo. *Tolbert*, 92 F.4th at 1273.

The Supreme Court has recognized "a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). But "a suggestive preindictment identification procedure does not in itself intrude upon a constitutionally protected interest." *Manson v. Brathwaite*, 432 U.S. 98, 113 n.13 (1977).[3] Rather, the suggestiveness "must create a very substantial likelihood of irreparable misidentification" to warrant exclusion of a witness's identification testimony. *United States v. Thody*, 978 F.2d 625, 629 (10th Cir. 1992). In other words, the suggestive photo array "must so affect the witnesses' perceptions as to render their subsequent in-court testimony unreliable." *Id*. Ultimately, "reliability is the linchpin in determining the admissibility of identification testimony." *Manson*, 432 U.S. at 114. The relevant constitutional concern is that an eyewitness misidentification may deprive a criminal defendant of his right to a fair trial, as

---

[3] In *Manson*, the Supreme Court explicitly declined to adopt a per se rule excluding all identifications based on suggestive photo arrays. 432 U.S. at 112. The Court reasoned such a rule would go "too far since its application automatically and peremptorily, and without consideration of alleviating factors, keeps evidence from the jury that is reliable and relevant." *Id*.

secured by the Due Process Clause of the Fourteenth Amendment. *Johnson v. City of Cheyenne*, 99 F.4th 1206, 1219 (10th Cir. 2024).

We employ a two-part test to determine when an identification based on a suggestive photo array violates a defendant's Due Process rights. First, we "determine whether the photo array was unduly suggestive." *United States v. Kamahele*, 748 F.3d 984, 1019 (10th Cir. 2014). Second, if so, "we decide whether the identifications were still reliable in view of the totality of the circumstances." *Id*. In assessing reliability, we consider the five so-called *Biggers* factors: "(1) the opportunity of the witness to view the suspect during the crime, (2) the witness's level of attention during the crime, (3) the accuracy of the witness's prior description of the suspect, (4) the level of certainty the witness demonstrated during the array, and (5) the time lapse between the crime and the array." *Id*. at 1021 (*see also Neil v. Biggers*, 409 U.S. 188, 199—200 (setting forth factors relevant to reliability)). In this case, we need not decide whether the photo array procedure was unduly suggestive because we agree with the district court that Weaver's identification was sufficiently reliable under the *Biggers* factors to dispel any risk of misidentification.

First and foremost, Weaver had three encounters with Defendant, including a nearly ten-minute face-to-face conversation in Defendant's kitchen. All three encounters took place during daylight hours at close range. This is not the case of the "stranger who jumps out of the dimly lit alley . . . that would raise reasonable doubts about the witness's perception." *Johnson*, 99 F.4th at 1222 (internal quotation omitted). Weaver's three meetings with Defendant were sufficient for him to become familiar with Defendant's physical characteristics. *See United States v. Klein*, 93 F.3d 698, 702 (10th Cir. 1996)

9

(witness's identification of defendant based on three methamphetamine transactions was reliable); *see also United States v. Sierra*, 390 F. App'x 793, 798 (10th Cir. 2010) (informant's identification based on several methamphetamine transactions, including a face-to-face meeting in the defendant's living room, was reliable).

Second, Weaver exhibited a high degree of attention during his meetings with Defendant.  Weaver recalled Defendant's clothing from each of the three meetings.  Weaver noticed distinctive skin discoloration on Defendant's hands and arms.  He was attentive to Defendant's vehicle and described it in detail as an '80 or '90s square style, dark colored pickup truck.  Moreover, Weaver learned a host of details about Defendant's activities as a courier including the length of his career, his cut of the profits, his strategies to avoid detection, and the port of entry he typically crossed.

Third, Weaver's detailed, pre-photo array description closely matched Defendant.  Weaver described Tire Man as an older Hispanic male with grey hair, dressed in "cowboy style," with skin discoloration on both arms resembling chemical burns.  At the time of sentencing, Defendant was a 57-year-old Hispanic male with grey hair and skin discoloration on both hands.  Weaver also described Tire Man's vehicle as a dark-colored '80s or '90s square-bodied pickup.  Defendant was seized at the port of entry in a dark green 1997 or 1998 Chevrolet Silverado pickup with a square-style body.  The fact that Weaver provided an accurate description of Defendant *before* viewing the allegedly suggestive photo array mitigates the risk of misidentification.  *Cf. Johnson*, 99 F.4th at 1223.

10

Fourth, Weaver expressed confidence in his identification. Defendant argues this cannot be so because Weaver asked to see a lightened photo before making his identification. Defendant mischaracterizes the record. Special Agent Vargas testified that Weaver "focused immediately" on Defendant's photo when presented with the array. R. Vol. III at 28. Weaver testified that Defendant's photo depicted "the person that [he] knew" but "was too dark for [him] to be 100 percent certain." *Id*. at 349, 351. Once shown a similar, lighter photo of Defendant, Weaver unequivocally made a positive identification. At trial, Weaver affirmed he had "no doubt" that Defendant's photo represented the man who sold him methamphetamine. R. Vol. III at 341. In our view, Defendant's objection to Special Agent Vargas's use of a second photograph—rather than a lightened version of the first photo from the array—goes to the suggestiveness of the photo array procedure, not Weaver's confidence in his ultimate identification.[4]

Fifth, approximately eighteen-months lapsed between Weaver's last meeting with Defendant and his photo array identification. Such a gap "would be a seriously negative factor in most cases." *Biggers*, 409 U.S. at 201. Here, however, Weaver provided a detailed physical description of Defendant to law enforcement just one or two days after his last encounter with Defendant. Weaver's description was based on three interactions with Defendant for an amount of time sufficient to become familiar with Defendant's physical features, vehicle, and practices as a courier. Weaver repeated that description

---

[4] The lack of precedent for this situation suggests that showing a second, distinct photo of a subject in response to a witness's request for another photo is, at the very least, not a preferred police practice.

11

consistently and accurately numerous times before the allegedly corrupting influence of the photo array. These circumstances provide "sufficient independent basis for the identification." *United States v. Williams*, 605 F.2d 495, 498 (10th Cir. 1979). Weighing the *Biggers* factors, we hold no substantial likelihood of misidentification is present in this case. The identification was properly admitted before the jury.

**\*\*\***

We **AFFIRM** the district court's denial of Defendant's motion to suppress.

*United States* v. *Ruiz*, No. 23-2027

**ROSSMAN**, J., concurring

The majority opinion says, "In this case, we need not decide whether the photo array procedure was unduly suggestive because we agree with the district court that Weaver's identification was sufficiently reliable under the *Biggers* factors to dispel any risk of misidentification." Maj. Op. at 10. I agree with the reliability determination under *Neil* v. *Biggers*, 409 U.S. 188, 199–200 (1972), so I join in the decision to affirm. But I have no trouble concluding the photo identification procedure used to identify Mr. Ruiz was impermissibly suggestive.[1] And there are principled reasons for us to say so. Because the majority opinion does not reach suggestiveness, I respectfully write separately. First, I will describe how suggestiveness informs reliability. Second, I will explain why the photo identification procedure used to identify Mr. Ruiz was impermissibly suggestive.

**I**

There is no question, "reliability is the linchpin" of admissibility under the Due Process Clause. *Manson* v. *Brathwaite*, 432 U.S. 98, 114

---

[1] Courts—including the Supreme Court—refer to "impermissibly," "unnecessarily," and "unduly" suggestive searches interchangeably. *See, e.g., Neil* v. *Biggers*, 409 U.S. 188, 197–98 (1972) (using both "impermissibly" and "unnecessarily"); *Johnson* v. *City of Cheyenne*, 99 F.4th 1206, 1219–20, 1224 (10th Cir. 2024) (using "unnecessarily," "impermissibly," and "unduly").

(1977). And the majority correctly describes our two-step reliability inquiry: "First, we 'determine whether the photo array was unduly suggestive.' Second, if it was, 'we decide whether the identifications were still reliable in view of the totality of the circumstances.'" Maj. Op. at 9 (quoting *United States* v. *Kamahele*, 748 F.3d 984, 1019 (10th Cir. 2014)). We even may *assume* an identification procedure was unduly suggestive to "proceed to the 'linchpin' question" of reliability. *United States* v. *Bredy*, 209 F.3d 1193, 1195 (10th Cir. 2000) (quoting *Manson*, 432 U.S. at 114).

The fact we *can* assume suggestiveness does not mean we always should. When the circumstances allow, as they do here, I would conduct the suggestiveness inquiry in order to "weigh[] the corrupting effect of the suggestive identification" against indicia of reliability. *Manson*, 432 U.S. at 114. Doing so accords with Supreme Court doctrine, ensures the integrity of the reliability determinations, and may assist law enforcement in refining the reliability of their identification procedures.

The Supreme Court has consistently weighed suggestiveness against other circumstances as part of the admissibility inquiry. In *Stovall* v. *Denno*, the Court first recognized the Due Process Clause protects defendants from admission of identifications "unnecessarily suggestive and conducive to irreparable mistaken identification." 388 U.S. 293, 302 (1967). The Court explained "[t]he practice of showing suspects singly to persons

2

for the purpose of identification, and not as part of a lineup"—as occurred there—"has been widely condemned." *Id.* In other words, *Stovall* acknowledged the suggestiveness problem. Against that suggestiveness, the Court balanced the victim's impending death. *Id.* No due process violation occurred because the suggestive procedure was "imperative." *Id.*

The Supreme Court next passed on these issues in *Simmons* v. *United States*, 390 U.S. 377 (1968). Again, the Court emphasized how suggestive procedures can result in erroneous identifications. *Id.* at 383–84. *Simmons* also noted "the identification procedure employed may have in some respects fallen short of the ideal." *Id.* at 385–86. And it described how law enforcement could have improved that procedure. *Id.* at 386 n.6. Mr. Simmons' due process challenge failed, however, given (1) the low degree of suggestiveness present ("There is no evidence to indicate that the witnesses were told anything about the progress of the investigation, or that the FBI agents in any other way suggested which persons in the pictures were under suspicion"); and (2) indicia of necessity and reliability. *Id.* at 385.

Then, in *Foster* v. *California*, the Supreme Court found admission of an unduly suggestive identification violated the Due Process Clause. 394 U.S. 440, 443 (1969). The Court began by detailing the suggestive procedure at issue:

3

> [P]etitioner stood out from the other two men by the contrast of his height and by the fact that he was wearing a leather jacket similar to that worn by the robber. When this did not lead to positive identification, the police permitted a one-to-one confrontation between petitioner and the witness. . . . [S]ome days later another lineup was arranged. Petitioner was the only person in this lineup who had also participated in the first lineup.

*Id.* (citation omitted). "The suggestive elements in this identification procedure made it all but inevitable that [the witness] would identify petitioner[.]" *Id.* No factors seemed to indicate reliability or necessity. Rather, "the witness' identification of petitioner was tentative" during most of his time with the police. *Id.*

*Neil* v. *Biggers* and *Manson* v. *Braithwaite* solidified the doctrine. *Biggers* held "the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification'"—that is, reliability is our linchpin. 409 U.S. at 198 (quoting *Simmons*, 390 U.S. at 384). *Biggers* also outlined factors that indicate reliability. *Id.* at 199–200. Though *Biggers* centered on reliability, the Court still expressed "we are inclined to agree with the courts below that the police did not exhaust all possibilities in" creating a non-suggestive procedure. *Id.* at 199. Only "*then*"—after addressing undue suggestiveness—did *Biggers* "turn . . . to the central question, whether . . . the identification was reliable even though the confrontation procedure was

4

suggestive." *Id.* (emphasis added). *Biggers* ultimately found "no substantial likelihood of misidentification." *Id.* at 201.

In *Manson*, the Court reaffirmed "reliability is the linchpin" of admissibility under the Due Process Clause. 432 U.S. at 114. *Manson* also instructed courts to use "the factors . . . set out in *Biggers*" to measure reliability. *Id.* The majority faithfully applied those factors here. But *Manson* also clearly instructed, "[a]gainst these factors is to be weighed the corrupting effect of the suggestive identification itself." *Id. Manson* heeded its own instruction. There, indicia of reliability were "hardly outweighed by the corrupting effect of the challenged identification," in part because "we find in the instant case little pressure on the witness to acquiesce in . . . suggestion." *Id.* at 116. The Court acknowledged, "[o]f course, it would have been better had" law enforcement used a less suggestive procedure. *Id.* at 117.

Cementing the importance of suggestiveness doctrinally is *Perry* v. *New Hampshire*. There, the Supreme Court held undue suggestiveness is a prerequisite for due process challenges to unreliable identifications. 565 U.S. 228, 248 (2012). *Perry* explained, "the [*Manson*] Court's reference to reliability appears in a portion of the opinion concerning the appropriate remedy *when the police use an unnecessarily suggestive identification procedure*." *Id.* at 241; *see also Johnston* v. *Makowski*, 823 F.2d 387, 391

(10th Cir. 1987) ("The two prongs of the inquiry should be made separately; it is necessary to reach the second prong only if the procedure was impermissibly suggestive.").

The Court's focus on suggestiveness provides reason enough for us to focus on it. Doing so fulfills our mandate and maintains consistency in the law. Though considering suggestiveness serves other purposes, too.

First, developing law on suggestiveness will improve reliability determinations in close cases. As the *Biggers* factors reveal reliability in a sea of facts, a robust body of law on suggestiveness would help us recognize *unreliability. Cf.* Ofer Raban, *On Suggestive and Necessary Identification Procedures*, 37 Am. J. Crim. L. 53, 67 (2009) ("The importance of weighing suggestiveness against reliability is self-explanatory—the more suggestive the procedure, the greater the risk of misidentification absent strong reliability indicators.").

The cases I have discussed illustrate as much. In *Simmons*, the Supreme Court compared strong indicia of reliability ("Five bank employees had been able to see the robber . . . for periods ranging up to five minutes") to the weak indicia of unreliability present because the identification procedure was only moderately suggestive ("Each witness was alone when he or she saw the photographs."). 390 U.S. at 385. The Court did the same in *Manson*, where strong indicia of reliability (the witness "looked directly

6

at" a perpetrator and described him to law enforcement "within minutes of the crime") again outweighed weak indicia of unreliability (there "was little urgency and [the witness] could view the photograph at his leisure"). 432 U.S. at 114, 116. Often, as here, the *Biggers* factors will be clear enough that a suggestiveness inquiry would not change our reliability conclusion. But if we do not use these clearer cases to develop the doctrine, we will not have a doctrine to use for the harder ones.

Second, judicial acknowledgement of unduly suggestive identification methods may help guide law enforcement.[2] "Police officers [are] engaged in the dangerous and difficult tasks associated with protecting the safety of our communities[.]" *Jaffee* v. *Redmond*, 518 U.S. 1, 11 n.10 (1996). Yet our constitutional protections "would evaporate" if we did not scrutinize law enforcement's compliance with them. *Beck* v. *Ohio*, 379 U.S. 89, 97 (1964). After all, "in the first instance, it is law enforcement . . . that can best ensure against an undue risk of convicting the innocent." *Dennis* v. *Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 344 (3d Cir. 2016) (McKee, J., concurring); *cf.* Tom

---

[2] Notably, the Due Process Clause binds officers who use suggestive procedures intentionally or unintentionally. *Perry* v. *New Hampshire*, 565 U.S. 228, 232 n.1 (2012) ("[W]hat triggers due process concerns is police use of an unnecessarily suggestive identification procedure, whether or not they intended the arranged procedure to be suggestive."). *But see id.* at 250 (Sotomayor, J., dissenting) (opining "the Court effectively grafts a *mens rea* inquiry onto our [due process] rule"). I do not suggest police *intended* to deploy an unnecessary suggestive procedure in this case.

R. Tyler, *Viewing CSI and the Threshold of Guilt: Managing Truth and Justice in Reality and Fiction*, 115 Yale L.J. 1050, 1079 (2006) ("Acceptance of the case put forward by the prosecution during a criminal trial is heavily dependent upon a juror's willingness to trust the honesty and the competence of the state—including the police (who investigate crimes) and the prosecutors (who manage criminal trials)."). Some of our guidance can be understood as deterrence, particularly when we identify suggestive procedures that cut against a finding of reliability. Indeed, "[a] primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper [procedures] in the first place." *Perry*, 565 U.S. at 241; *see also Manson*, 432 U.S. at 112 ("The police will guard against unnecessarily suggestive procedures under the totality rule . . . for fear that their actions will lead to the exclusion of identifications as unreliable.").

## II

An identification procedure is "impermissibly suggestive" when it unnecessarily creates (or increases) a danger that the witness will misidentify the defendant. *See Simmons*, 390 U.S. at 384; *Biggers*, 409 U.S. at 198 ("Suggestive confrontations are disapproved because they increase the likelihood of misidentification[.]"). The identification procedure used in this case was impermissibly suggestive. And, in my view, it is not a close

question. The district court's contrary conclusion was erroneous, even under the deferential clear-error standard we are bound to apply. *See United States* v. *Worku*, 800 F.3d 1195, 1203 (10th Cir. 2015) ("We apply the clear-error standard to findings involving suggestiveness of a photo array.").

To determine whether a photo identification procedure is unduly suggestive, we consider "factors" like "the size of the array, the manner of its presentation by the officers, and the details of the photographs themselves." *United States* v. *Sanchez*, 24 F.3d 1259, 1262 (10th Cir. 1994). Looking at each, I would find the identification procedure used in this case unduly suggestive.

To begin, we must give "significant weight" to any "irregularities" in the photo array shown to Mr. Weaver because it included only six photographs. *Worku*, 800 F.3d at 1203; *see also Sanchez*, 24 F.3d at 1262 ("Common sense dictates that slight irregularities are more likely to 'jump out' at a witness reviewing a single sheet of paper with only six photographs on it than at a witness reviewing a large mug book containing hundreds of photographs."). This is not a "substantive factor" indicating suggestiveness, but it requires us to closely "scrutinize[]" the photo array. *Sanchez*, 24 F.3d at 1262–63. The array shown to Mr. Weaver cannot withstand the close look we must give it.

9

To evaluate the suggestiveness of a photo array in this context, we consider whether a defendant's photo "stands out from the others in the array." *See United States* v. *Wiseman*, 172 F.3d 1196, 1209 (10th Cir. 1999), *abrogated on other grounds*, *Rosemond* v. *United States*, 572 U.S. 65 (2014); *see also Grubbs* v. *Hannigan*, 982 F.2d 1483, 1490 (10th Cir. 1993) (finding photo array unnecessarily suggestive due to obvious differences between the suspect's photo and fillers). As demonstrated by the photo array, Mr. Ruiz's photo "stood out" in at least three ways.[3]



---

[3] The photo array appears in the record at Appellee's Supplemental Appendix page 1.

10

It was significantly darker, he was the only one pictured with a face mask—indicating he had been recently arrested, during the COVID-19 pandemic—and his photo was the only one taken against a horizontal-line background. In addition to irregularities in the individual photographs, we look to the methods used to obtain an identification. *See Sanchez*, 24 F.3d at 1262. Courts have long recognized law enforcement's actions can have powerful suggestive effects. *See, e.g.*, *id.* (explaining the "manner of [a photo array's] presentation by the officers" is a relevant factor when evaluating suggestiveness); *United States* v. *Wade*, 388 U.S. 218, 228 (1967) ("A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification."). Suggestive actions "are those which convey 'intentionally or unintentionally, that [police officers] expect the witness to identify the accused,' or are 'so arranged as to make the resulting identifications virtually inevitable.'" *United States* v. *O'Neil*, 62 F.4th 1281, 1288 n.9 (10th Cir. 2023) (alteration in original) (first quoting *Moore* v. *Illinois*, 434 U.S. 220, 224 (1977); then quoting *Foster*, 394 U.S. at 443).

When police showed Mr. Weaver the photo array, he requested a lighter photo of Mr. Ruiz. As Mr. Ruiz persuasively argues, the police response was unnecessarily suggestive.

11

First, instead of showing Mr. Weaver another photo *array*, officers showed him a standalone photo of Mr. Ruiz. And the photo they showed communicated to Mr. Weaver that officers had multiple, readily available photos of Mr. Ruiz but not others in the initial array—likely because Mr. Ruiz was already in custody. For instance, instead of simply providing a lightened version of the original photo, officers showed a different one entirely.[4] The second photo was clearly taken on the same day as the original; Mr. Ruiz was in the same clothing. However, it was taken from a different angle, the lighting was different, and the mask previously around Mr. Ruiz's neck was gone. Driving the point home, the second photo revealed the horizontal-line background in Mr. Ruiz's original photo measured height, like one would expect from a mugshot background. In this way, law enforcement telegraphed to Mr. Weaver he had picked the right guy. *Foster*, 394 U.S. at 443 (explaining identification procedure is unnecessarily suggestive if it "make[s] the resulting identifications virtually inevitable").

---

[4] Mr. Ruiz's standalone photo appears in the record at Appellee's Supplemental Appendix page 2.

12

Under these circumstances, I would conclude the photo identification in this case was unduly suggestive.

***

The stakes are high to improve the practice and adjudication of eyewitness identifications. "[E]yewitness misidentification is 'the single greatest cause of wrongful convictions in this country.'" *Perry*, 565 U.S. at 263 (Sotomayor, J., dissenting) (quoting *State* v. *Henderson*, 27 A.3d 872, 885 (N.J. 2011)); *see also Wade*, 388 U.S. at 229 (similar). There are multiple reasons for this problem: "Science has proven that memory is malleable." *Henderson*, 27 A.3d at 895. But still, as Justice Brennan recognized, "there is almost *nothing more convincing* [to a jury] than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!'" *Id.* at 889 (alteration in original) (quoting *Watkins* v. *Sowders*, 449 U.S. 341, 352 (1981) (Brennan, J., dissenting) and citing additional research).

Courts have a role to play in addressing the problem. The Third Circuit created a Task Force "to promote reliable practices for eyewitness investigation and to effectively deter unnecessarily suggestive identification procedures, which raise the risk of wrongful conviction." *2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications*, 92 Temp. L. Rev. 1, 7 (2019); *see also id.* at 10 (observing "[e]yewitness misidentifications have been a factor in well

13

over half of the cases that resulted in wrongful convictions later overturned by DNA evidence"); *United States* v. *Gallegos*, 111 F.4th 1068, 1081 n.8 (10th Cir. 2024) (acknowledging the "comprehensive report" on eyewitness identification authored by the Third Circuit task force). The New Jersey Supreme Court appointed a special master to "evaluate scientific and other evidence about eyewitness identifications" in light of questions about the "vitality of the current legal framework for analyzing the reliability of eyewitness identifications." *See Henderson*, 27 A.3d at 877. As I have hoped to show, developing the law on suggestive identification procedures may advance the overall goal of decreasing false convictions through wrongful identification. And the cost is small where, as here, the district court ruled on the suggestiveness of the identification procedure, the parties provided meaningful briefing on the issue, and a party urges us to address it.